[No. B138557. Second Dist., Div. Three. Jan. 24, 2001.]

HERMOSA BEACH STOP OIL COALITION et al., Plaintiffs and Appellants, v.
CITY OF HERMOSA BEACH et al., Defendants and Respondents;
WINDWARD ASSOCIATES et al., Real Parties in Interest.

536

**COUNSEL**

Chatten-Brown & Associates, Jan Chatten-Brown, Douglas P. Carstens; Law Offices of Joseph Di Monda and Joseph Di Monda for Plaintiffs and Appellants.

Richards, Watson & Gershon, Rochelle Brown and Michael Jenkins for Defendants and Respondents.

Bright & Brown, James S. Bright, Maureen J. Bright, John Quirk and Phillipa L. Altmann for Real Parties in Interest.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, and Tara L. Mueller, Deputy Attorney General, for the People of the State of California as Amici Curiae.

## OPINION

**PERLUSS, J.*—**Plaintiffs and appellants Hermosa Beach Stop Oil Coalition, Heal the Bay, Santa Monica Baykeeper and American Oceans Campaign (hereafter collectively referred to as Stop Oil) appeal from a judgment after a bench trial entered in favor of defendants and respondents City of Hermosa Beach and City Council of the City of Hermosa Beach (the City) and real parties in interest and respondents Windward Associates and Macpherson Oil Company (Macpherson). The judgment denied Stop Oil's request for injunctive and declaratory relief. Macpherson has filed a cross-appeal, asserting additional grounds to support the trial court's judgment.

The essential question presented is whether reinstatement of a total ban on oil drilling within the City, adopted through the initiative process in November 1995 (Proposition E), constitutes an unconstitutional impairment of the 1992 lease agreement between Macpherson and the City for oil and gas exploration and production on City-owned property.

The trial court ruled that application of Proposition E to the Macpherson oil drilling project would constitute an unconstitutional impairment of the lease agreement between Macpherson and the City. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*[1]

 a. *Authorization of oil exploration within the City.*

In 1932 the voters of the City enacted a ban on all oil and gas operations within the City, declaring such activity to be both unlawful and a public nuisance.[2] (Hermosa Beach Mun. Code, § 21-10.)

In 1984, to generate the funds needed to acquire open space and parklands within the City, the voters adopted Propositions P and Q, council-sponsored ballot measures creating exceptions to the ban on oil exploration and production for two publicly owned sites within the City: the City Yard Site, a

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]The factual background of this case, although extensive, is largely undisputed. The parties submitted a substantial volume of evidence in written form for the trial court to consider in evaluating the legal issues presented; no live testimony was taken. The facts summarized in this opinion are taken from those evidentiary submissions, viewed in the light most favorable to the respondents in those instances in which there is a conflict.

[2]Any oil wells then operating or under construction within the City were exempted from the ban. (Hermosa Beach Mun. Code, § 21-10.)

parcel owned by the City and being used as its maintenance yard; and the School Site, a parcel owned by the local school district. (Hermosa Beach Mun. Code, § 21-10, subds. (a) & (b).)

In 1985 the City adopted an ordinance establishing the Hermosa Beach Oil Code, regulating the development and design of oil recovery projects and establishing a permit system for drilling and oil recovery operations in the City. (Hermosa Beach Ord. No. 85-803.) The ordinance recited the City's intent to allow for oil production "in a manner that protects the health, safety and welfare of the citizens of Hermosa Beach." (Hermosa Beach Ord. No. 85-803.) Section 21A-2.3 of the code provides, "No person shall be issued a drilling permit until the same has been approved by the Building and Safety Director with concurrence by the Planning Director, and found to be in compliance with all applicable laws, ordinances and regulations." (Hermosa Beach Mun. Code, § 21A.2.3.)

b. *The lease agreements between the City and Macpherson.*

In June 1986 the City published a request for proposals for oil exploration and production at the two sites. Macpherson Oil Company, which had in 1976 proposed developing oil resources in the tidelands of Hermosa Beach and had been a leading force in placing the 1984 ballot measures before the voters, was the only company to respond to the City's request.

Negotiations ensued between the City and Macpherson and resulted in an agreement, Oil and Gas Lease No. 1.[3] The initial, 1986 lease with the City involved the City Yard Site and related only to the onshore mineral rights acreage owned by the City, referred to as the "uplands." That lease was amended later in 1986 and again in 1988 and 1991. In January 1992 the parties entered into a second lease, Oil and Gas Lease No. 2, which superseded the initial lease and its various amendments. Oil and Gas Lease No. 2, which again involves only the City Yard Site, covers not only the uplands but also the submerged mineral rights acreage owned by the City, known as the "tidelands." The 1992 lease remains the operative agreement between the City and Macpherson.[4]

Under the lease Macpherson obtained the right to conduct oil and gas operations within the City. The City was obligated to deliver the City Yard

[3] The initial lease agreement was between the City and real party in interest Windward Associates, a limited partnership, through its general partner Donald Macpherson. Macpherson Oil Company is the proposed operator of the lease on the City-owned property.

[4] Initially Macpherson intended to operate two separate drilling projects at the City Yard Site and the School Site. By 1992, the proposed project had been modified to concentrate all operations in an integrated design at the City Yard Site.

Site to Macpherson for use as a drill site and to obtain State Lands Commission (SLC) approval to allow drilling for oil in the tidelands. The lease requires Macpherson to obtain all necessary permits and regulatory authorizations before proceeding to construct the drill site and begin drilling, including a conditional use permit (CUP) for the project from the City and a coastal development permit from the California Coastal Commission.

The proposed oil exploration and production project was to begin with three exploratory wells, with up to 27 additional wells (30 total) to be drilled if the initial exploration proved successful. The Macpherson-City lease and the CUP obtained by Macpherson authorized construction of a 135-foot-high oil derrick (equivalent to a 15-story building), which would operate during the four-and-one-half-year exploratory and drilling phase of the project. Thereafter, workover rigs up to 110 feet high could operate on the property up to 90 days a year for 35 years. Project plans called for construction of a pipeline to transport the crude oil product to a nearby refinery outside the city limits.

 c. *Macpherson pursues the regulatory approval process.*

Between 1986 and 1990 Macpherson developed three different proposed project descriptions. In addition, in connection with the SLC application filed by the City on behalf of Macpherson, Macpherson prepared an environmental impact report (EIR) pursuant to the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

*The EIR.* The first draft of an EIR was circulated for public review and comment in May 1989. On May 8, 1990 the City certified a revised EIR and adopted a statement of overriding conditions for the project pursuant to the requirements of CEQA. At the same time the City approved a general land use plan and the zoning code amendments needed for Macpherson to proceed with the project.

*The CUP.* On August 10, 1993, after an extended review process, the City approved a CUP for the Macpherson project. The CUP contained 140 conditions, requiring submission to and approval by the City of a number of additional reports, plans and analyses prior to the issuance of any permit for commencing work. For example, both an oil spill prevention control plan and an oil drilling contingency plan needed to be approved by the state Division of Oil and Gas and the City's fire and building and safety departments. In addition, the CUP specifically required the property to be "developed, maintained and operated in full compliance with the conditions of this grant and any law, statute, ordinance or other regulation applicable to any development or activity on the subject property."

An addendum to the EIR was approved by the City at the same time it approved the CUP.

Hermosa Beach Stop Oil Coalition, Santa Monica Baykeeper and American Oceans Campaign, three of the plaintiffs in this action, filed a challenge to the adequacy of the EIR and the approval of the CUP by the City in September 1993. (*Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (Super. Ct. L.A. County, 1993, No. BS025250).) The trial court initially determined that the project as proposed violated the size restrictions in the 1984 referendum approving the exception to the oil drilling ban and thus invalidated the CUP. That decision was reversed by the Court of Appeal in an unpublished decision in June 1996, and the case returned to the trial court for further proceedings on CEQA issues. (*Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (June 24, 1996, B090473).) The lawsuit was finally concluded in September 1997 when Hermosa Beach Stop Oil Coalition and the other petitioners abandoned their appeal of the trial court's judgment denying a writ of mandate on the CEQA issues on the ground that the challenge was untimely.

*The SLC.* Concurrently with the processing of the CUP, the City and Macpherson jointly proceeded before the SLC to obtain approval for the project's proposed development of oil reserves in the tidelands, as required by the 1992 lease. The SLC approved the lease on April 28, 1993. As a result of another lawsuit initiated by the Hermosa Beach Stop Oil Coalition in August 1993 (*Hermosa Beach Stop Oil Coalition v. State Lands Com.* (Super. Ct. L.A. County, 1993, No. BS024656)), the matter was returned to the SLC in January 1994 with directions that it specifically determine whether the project was in the best interests of the state. A second approval from the SLC was obtained in March 1994.

*The Coastal Development Permit.* In September 1993 Macpherson submitted an application for a coastal development permit to the California Coastal Commission for the proposed project. That application was withdrawn in January 1995. A new application for a coastal development permit was submitted in November 1996. On February 4, 1998 the Coastal Commission authorized its staff to issue the coastal development permit once certain conditions, including approval of a hazard and operability study, had been satisfied.

d. *Adoption of Proposition E.*

Beginning in April 1994 the Hermosa Beach Stop Oil Coalition began a campaign to qualify a ballot initiative to end the Macpherson project and to

reinstate the comprehensive prohibition on oil drilling in the City by deleting from the Municipal Code the two exceptions from the ban that had been approved in 1984. (Hermosa Beach Mun. Code, § 21-10, subds. (a) & (b).) The measure, Proposition E, appeared on the November 1995 ballot.

In addition to deletion of subdivisions (a) and (b) from section 21-10 of the Hermosa Beach Municipal Code, Proposition E contains a declaration of intent: "Purpose and Findings. Clean water, pure air, and a safe environment are vital to maintaining the quality of life in the South Bay. The People of the City of Hermosa Beach find safety and protection of the lives of its citizens and the public generally, and protection of persons and property from the dangers of fire, explosions, pollution, and other hazards, demand and require that the drilling or operating for the discovery of and/or production of oil, gas, hydrocarbon, or other related substances be prohibited, as in this ordinance set forth . . . ."[5]

The "Impartial Analysis of Proposition E" by the Hermosa Beach City Attorney circulated to all voters explained, "The effect of this measure, if adopted, would be to amend the Municipal Code to prohibit oil and gas exploration, drilling and production on these two sites [the two sites then excepted from the citywide prohibition], and eliminate from the Code the authority to use these sites as a potential source of oil and gas revenue for the restricted purposes stated in the Code. [¶] The City has leased the City maintenance yard site to a private entity for oil and gas exploration and production activities which have not yet commenced. All permits necessary

---

[5]Proposition E provides:

"An Ordinance of the City of Hermosa Beach, California, Deleting from the Municipal Code Paragraphs (a) and (b) of Section 21-10 Relating to the Two Exceptions to the Citywide Oil Well Drilling Prohibition Which Are Located at the City Yard Site (6th Street and Valley Drive) and the Former South School Playground (5th Street and Valley Drive).

"The People of the City of Hermosa Beach Do Ordain as Follows:

"Section 1. Purpose and Findings. Clean water, pure air, and a safe environment are vital to maintaining the quality of life in the South Bay. The People of the City of Hermosa Beach find the safety and protection of the lives of its citizens and the public generally, and protection of persons and property from the dangers of fire, explosions, pollution, and other hazards, demand and require that the drilling or operating for the discovery of and/or production of oil, gas, hydrocarbon, or other related substances be prohibited, as in this ordinance set forth; now, therefore,

"Section 2. Paragraphs (a) and (b) of Municipal Code Section 21-10, Oil Wells Prohibited, Exceptions are hereby deleted in their entirety.

"Section 3. If any portion of this ordinance is declared invalid, the remaining portion is to be considered valid.

"Section 4. There shall be no modification, amendment or repeal of any provisions of this initiative except by a vote of the people." (Official Sample Ballot (Nov. 7, 1995) Proposed Ordinance—Prop. E.)

for this project have not been issued and have been delayed by pending litigation. If Proposition E is adopted, the law is not clear exactly how the measure would affect the project proposed by the lease." The ballot arguments in favor of and against Proposition E focused on the potential environmental risks and economic benefits of the Macpherson project on the City Yard Site.

Proposition E was approved with 56 percent of the vote: 2,505 "yes" votes were received; 1,940 "no" votes.

Notwithstanding Proposition E's adoption by the voters, the City continued to perform under its lease with Macpherson based on its concern that it would face legal exposure if it terminated the lease agreement. When notified of the City's decision to continue to respect the lease agreement, Stop Oil commenced this lawsuit in April 1997 for declaratory and injunctive relief to require the City to apply Proposition E to the Macpherson project.

2. *Proceedings.*

a. *The parties.*

Hermosa Beach Stop Oil Coalition is an unincorporated group primarily composed of residents of the City. As discussed in the preceding section of this opinion, the Hermosa Beach Stop Oil Coalition has been active in opposing the Macpherson project and was the primary proponent of Proposition E.

The Hermosa Beach Stop Oil Coalition was joined as plaintiff in this lawsuit by three California not-for-profit organizations concerned with various aspects of monitoring and protecting the environmental quality of Santa Monica Bay and its environs: Heal the Bay, Santa Monica Baykeeper and American Oceans Campaign.

Stop Oil named the City as the defendant in its action for declaratory and injunctive relief, as well as two real parties in interest: Real party in interest Windward Associates, a limited partnership, is the lessee of the City Yard Site. Real party in interest Macpherson Oil Company is the proposed operator of the oil and gas production project on the site.

b. *The pleadings.*

Stop Oil's complaint seeks a declaration (and parallel injunction) that Proposition E applies to the Macpherson project and that as a result the City may not issue building, well or drilling permits.

In its answer the City asserted that Proposition E was not retroactive and therefore did not apply to the Macpherson project and that application of Proposition E to the 1992 lease agreement between Macpherson and the City would constitute an impermissible impairment of contract. Macpherson's answer also alleges that Proposition E does not apply to the City Yard Site project and that, were it to be so applied, Proposition E would constitute an unconstitutional impairment of contract. In addition, Macpherson contends that Proposition E cannot be applied to the project based on the doctrine of vested rights and government estoppel.

### c. *The trial court's tentative decision.*

Stop Oil, the City and Macpherson each submitted multiple briefs and presented evidence to the trial court in written form. A hearing was held on July 23, 1998, at which all parties presented extensive argument.

On November 4, 1998, the trial court announced its tentative decision denying Stop Oil's request for declaratory and injunctive relief. The trial court ruled that there was no doubt that Proposition E was intended to apply to the Macpherson project. It held, however, that application of Proposition E to the project would be an unconstitutional impairment of contract.

"The voters by initiative may repeal any law including the limited exceptions to the oil ban. They may not by legislative fiat extinguish a valid subsisting contract (here the McPherson [sic] lease) without a demonstration that such total impairment of the contract is reasonable and justified because it is compelled by real threats to the health, safety and welfare of the community. . . . [¶] . . . [¶] The record fails to demonstrate a sufficient basis to justify Proposition E's impairment of the McPherson [sic] lease. The lease contemplates that the permits required under its provisions be issued or denied upon consideration of the merits attendant to the activities contemplated. Most of these factors have either been aired, addressed and adjudicated in favor of the lease in proceedings which have long since become final, or are addressed in the 140 odd conditions which McPherson [sic] must satisfy in order to commence drilling. Plaintiffs have not demonstrated any compelling or valid basis upon which the 'City voters' 'legitimately exercised their police power for the protection of their heath [sic], safety and welfare,' not previously determined in favor of the lease in the prior proceedings."

The trial court additionally held that the application of vesting principles in this case is not significant because the City, not Macpherson, owns the property. If the lease could be cancelled "without incurring liability for

normal (benefit of the bargain) damages[,]" Macpherson would be entitled only to an absolute right of recovery for the amounts it had actually expended under vesting principles.

 d. *The City's decision to terminate the project and Macpherson's cross-complaint.*

In January 1998, during the pendency of proceedings in the trial court and in connection with the hazard analysis required by the Coastal Commission, the City authorized an independent review and risk assessment of the project. The Aspen/Bercha Group was hired and ultimately produced a report that was presented to the City at a public hearing on September 17, 1998.[6]

At the conclusion of the hearing, based primarily on the information contained in the Aspen/Bercha report, the city council, by a vote of three to zero, determined that the dangers to public health and safety posed by the project were substantial and unacceptable and agreed to terminate the project. The council adopted findings that the most serious risk presented by the project would be the escape of a methane gas cloud that, if ignited, could cause a catastrophe and that, even if operated according to industry standards, the project posed safety risks that could not be mitigated to an acceptable degree.

The trial court learned of the City's action and inquired of the parties on October 20, 1998 whether this lawsuit had become moot. All parties and ultimately the court were in agreement that it had not.

Macpherson filed a cross-complaint on December 10, 1998 against the City for breach of contract, alleging that the Aspen/Bercha report did not demonstrate any previously unknown or undisclosed risk that had not already been appropriately mitigated or dismissed as not significant. The City answered, asserting that it was entitled to exercise its discretion to deny further permits and thus to terminate the project based on the public safety concerns identified in the report. The cross-complaint has been severed from the original action,[7] which proceeded to judgment.

---

 [6]The final Aspen/Bercha report was not introduced into evidence in connection with the trial of Stop Oil's request for declaratory and injunctive relief, although a substantially similar draft version of the report was submitted to the trial court.

 [7]On March 9, 2000, subsequent to the filing of the notice of appeal in this matter, the trial court issued a tentative decision on the cross-complaint, finding that the City's action constituted a breach or impairment of the lease and concluding that "the sole remedy is an

e. *The trial court's judgment, Stop Oil's appeal and the cross-appeal.*

The trial court's tentative decision became its final statement of decision. On November 17, 1999 judgment was entered denying Stop Oil's complaint for injunctive and declaratory relief.

Stop Oil has filed a timely appeal. Macpherson has filed a timely, but unnecessary, cross-appeal asserting two additional grounds in support of the trial court's decision denying declaratory and injunctive relief.[8]

## CONTENTIONS

Stop Oil contends: Proposition E applies to the Macpherson project; application of Proposition E's ban on oil drilling to the property leased by Macpherson is authorized by the lease agreement itself; and Proposition E is a valid exercise of the City's police power that does not constitute an unconstitutional impairment of the Macpherson lease agreement with the City. Macpherson contends: it has a vested right to pursue oil exploration and production at the City Yard Site; and Proposition E impermissibly interferes with that right.

## DISCUSSION

1. *Standard of review.*

■ Whether Proposition E was intended to have retroactive application and thus applies to the Macpherson project is a question of statutory interpretation reviewed de novo on this appeal. (*Rosasco v. Commission on Judicial Performance* (2000) 82 Cal.App.4th 315, 318 [82 Cal.App.4th 1041a, 98 Cal.Rptr.2d 111]; *Quackenbush v. Mission Ins. Co.* (1997) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112].) ■ Similarly, since there is

invalidation of the action causing impairment, which essentially results in a requirement of specific performance." Macpherson's request pursuant to Evidence Code sections 452 and 459 that this court take judicial notice of the March 9, 2000 tentative decision is granted. It appears that this tentative decision was subsequently adopted as the trial court's statement of decision. Judgment was entered on the cross-complaint on December 8, 2000.

[8]Macpherson's cross-appeal seeks review of two adverse rulings by the trial court that, if reversed, would each provide an alternative basis for affirming the trial court's decision to deny Stop Oil's request for declaratory and injunctive relief. Both of these grounds for affirmance are properly urged by Macpherson under Code of Civil Procedure section 906 without the need for a cross-appeal. (*Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1671 [56 Cal.Rptr.2d 362]; *Citizens for Uniform Laws v. County of Contra Costa* (1991) 233 Cal.App.3d 1468, 1472 [285 Cal.Rptr. 456]; see *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].)

no competent conflicting parol evidence as to the meaning of the lease agreement as it relates to the issues on this appeal, we independently construe the 1992 agreement between the City and Macpherson. (*Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62, 69 [79 Cal.Rptr.2d 902]; *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 754 [29 Cal.Rptr.2d 177]; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 [6 Cal.Rptr.2d 554].)

■ The ultimate question whether Proposition E constitutes an unconstitutional impairment of the Macpherson lease agreement with the City is likewise a question of law subject to independent review. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1129 [61 Cal.Rptr.2d 207]; *State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67 [60 Cal.Rptr.2d 342].) To the extent disputed "primary" or "historic" facts were resolved either expressly or impliedly by the trial court in analyzing the impairment issue, we review those findings under the substantial evidence standard. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813]; see *Board of Administration v. Wilson, supra,* 52 Cal.App.4th at p. 1129.) Determining whether on the facts found Proposition E impermissibly impairs Macpherson's rights under the 1992 lease agreement, including an evaluation of the significance of the facts so found in light of applicable legal principles, however, remains a question of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Board of Administration v. Wilson, supra,* 52 Cal.App.4th at p. 1129.)

2. *Proposition E applies to the Macpherson project.*

■ The power of the people through the statutory initiative is coextensive with, not greater than, the power of the Legislature. (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 669 P.2d 17].) In general, voters may not enact a statute or ordinance that the legislative authority itself has no power to enact. (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 821 [226 Cal.Rptr. 81, 718 P.2d 68]; *Legislature v. Deukmejian, supra,* 34 Cal.3d at p. 675.) Measures adopted by the voters through the initiative process, moreover, are subject to the ordinary rules and canons of statutory construction. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1212 [246 Cal.Rptr. 629, 753 P.2d 585].)

■ Statutes do not operate retroactively unless there is a clear indication of intent that they do so. (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507]; *Evangelatos v. Superior Court, supra,* 44 Cal.3d at pp. 1208-1209.) Intent with regard to prospective or retroactive application may be determined from either the language in the statute itself or, if the extrinsic sources are sufficiently clear,

legislative history. (*Western Security Bank v. Superior Court, supra,* 15 Cal.4th at p. 243; *Evangelatos v. Superior Court, supra,* 44 Cal.3d at pp. 1209-1210.)

In this case the parties disagree not only whether Proposition E applies to the Macpherson project but also whether enforcement of Proposition E with respect to the project would even constitute a "retroactive" application of the law. A statute has retroactive effect if it substantially changes the legal effect of past events. (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 281 [32 Cal.Rptr.2d 807, 878 P.2d 566]; *Kizer v. Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679]; *Aktar v. Anderson* (1997) 58 Cal.App.4th 1166, 1182 [68 Cal.Rptr.2d 595].) "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment [citation], or upsets expectations based on prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events *completed* before its enactment." (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 269-270 [114 S.Ct. 1483, 1499, 128 L.Ed.2d 229], fn. omitted, italics added; *Kizer v. Hanna, supra,* 48 Cal.3d at p. 7.)

■ Application of Proposition E to prohibit the future issuance of drilling and building permits to the Macpherson project appears to be a prospective application of the law only, although one that plainly upsets expectations grounded in the prior law. We agree with the trial court, however, that resolution of this issue is unnecessary because the intent that Proposition E apply to the Macpherson project is unambiguous and unmistakable.[9]

By its express terms Proposition E repealed the two specific exceptions to the total prohibition on oil drilling in Hermosa Beach, thus making *all* such activity in the future a violation of the Hermosa Beach Municipal Code. Unlike the initial drilling ban adopted in 1932, Proposition E did not exempt existing projects from its sweep. Without such an exemption, the City was effectively disabled by Proposition E from issuing to Macpherson the building or drilling permits necessary for its project. In this context the language of the proposition can only be interpreted as applying to the Macpherson project. (See *Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972, 980-981 [68 Cal.Rptr.2d 553].)

The ballot arguments in support of and opposition to Proposition E focused on the benefits and risks associated with the Macpherson project,

[9]The trial court found that "Proposition E, was conceived, promoted and enacted to preclude oil drilling in the City including any by McPherson [*sic*] under its lease."

providing further evidence that the intent of the voters was for Proposition E to apply to the project. (*Evangelatos v. Superior Court, supra,* 44 Cal.3d at p. 1212.) For example, the argument in favor of Proposition E asserts "the original low-key, 4-6 well concept has exploded into an enormous industrial eyesore" and "this project would be the first to violate the integrity of the Santa Monica Bay Sanctuary." The argument against Proposition E states, "The people pushing Proposition E want us to turn our backs on a legally binding contract. They want us to reject the $100 MILLION that contract will provide Hermosa Beach."

The independent analysis by the city attorney that accompanied the ballot arguments, while expressing some doubt whether Proposition E could lawfully be enforced so as to stop the Macpherson project, does not in any way suggest Proposition E is not intended to apply to the project. To the contrary, if Proposition E were drafted to exclude the proposed Macpherson project, there would be no reason to opine whether such an application would be valid.

Finally, the intent of the drafters of the proposition, Stop Oil, plainly was to preclude Macpherson from proceeding with the project. Absent some basis for determining that the intent of the electorate was in conflict with the intent of the drafters, evidence of the drafters' intent is an appropriate tool in interpreting the scope of an initiative. (*Evangelatos v. Superior Court, supra,* 44 Cal.3d at p. 1212.)

3. *Neither the doctrine of vested rights nor the concept of government estoppel precludes application of Proposition E to the Macpherson project.*

In opposition to Stop Oil's request for declaratory and injunctive relief, Macpherson asserted in the trial court and again in its "cross appeal" in this court that it has acquired "vested rights" to continue with the oil exploration and production project, which preclude application of Proposition E to the City Yard project. The trial court properly rejected this claim.

"The vested rights doctrine is ' "predicated upon estoppel of the governing body." ' [Citation.] This is a principle of equitable estoppel which may be applied against the government where justice and fairness require it. [Citation.] [¶] An equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1) a promise such as that implied by a building permit that the proposed use will not be

prohibited by a class of restrictions that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment. [Citation.]" (*Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 866-867 [201 Cal.Rptr. 593, 679 P.2d 27].)

██ Macpherson's vested rights and equitable estoppel arguments[10] conflict with well-established authority holding that no right to develop vests until all final discretionary permits have been authorized and significant "hard costs" have been expended in reliance on those permits—that is, until substantial construction has occurred in reliance on a building permit. "In California, the developer's right to complete a project as proposed does not vest until a valid building permit, or its functional equivalent, has been issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit. [Citations.]" (*Toigo v. Town of Ross, supra,* 70 Cal.App.4th at p. 321; *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546]; accord, *Consaul v. City of San Diego* (1992) 6 Cal.App.4th 1781, 1801 [8 Cal.Rptr.2d 762] ["the vested rights doctrine enunciated in *Avco* has stood the test of time, and may properly be applied even to modern land use planning devices"].)

The record demonstrates that neither required element for establishing a vested right or estoppel against the government exists. At the time Proposition E was adopted, Macpherson had not received a coastal development permit and, in fact, did not even have a permit application pending before the Coastal Commission.[11] In addition, as of November 1995 (and still today) Macpherson had not obtained building or drilling permits from the City, which it explicitly agreed to obtain[12] and which are necessary for completion of the project.

Before those permits could issue, Macpherson was required by the CUP to submit for approval by the City additional studies and analyses, including an oil spill prevention control plan, an oil drilling contingency plan and a supplemental fire hazard analysis. The City thus retained considerable discretion whether to approve Macpherson's plans and issue the required

[10]"[T]here is no meaningful distinction between an estoppel claim and a vested right claim where land use is at issue. [Citations.]" (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 [82 Cal.Rptr.2d 649].)

[11]As discussed previously, Macpherson had submitted and then withdrawn its initial application for a coastal development permit.

[12]The 1992 lease requires Macpherson to apply for and obtain "all necessary drilling and well permits from the City of Hermosa Beach pursuant to the Hermosa Beach Municipal Code."

permits. (See *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 272-273 [235 Cal.Rptr. 788] [pursuant to CEQA, issuance of a building permit would be considered "discretionary" when application of judgment is required].)

In the absence of these permits, Macpherson can claim no vested right to continue with the project. "Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted. . . . California courts apply this rule most strictly . . . ." (*Toigo v. Town of Ross, supra,* 70 Cal.App.4th at p. 322.)

In addition, all of the expenses incurred by Macpherson prior to passage of Proposition E were "soft costs," expenditures for engineers, consultants and lawyers in connection with obtaining approvals from the SLC and the City. None of those expenses was for the type of "hard costs" required as a basis for recognizing a vested right to proceed with development. (*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d at p. 793 [work undertaken pursuant to governmental approvals preparatory to construction of buildings cannot form the basis of a vested right]; *Consaul v. City of San Diego, supra,* 6 Cal.App.4th at p. 1797 [predevelopment expenditures do not establish vested rights].)

In sum, with only a conditional use permit (as to which many conditions remained unfulfilled), no building permit and no substantial work done to construct the project, Macpherson can claim no vested right to preclude application of Proposition E to the oil drilling project at the City Yard Site. Instead, it possessed certain contract-based expectations, which must be balanced against the voters' exercise of the City's police powers through passage of Proposition E to determine whether the measure may be validly applied to terminate the project.

4. *Proposition E does not constitute an unconstitutional impairment of the Macpherson-City lease agreement.*

It is now axiomatic that the contract clauses of the federal and state Constitutions (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9) are not to be read literally. (*Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 502 [107 S.Ct. 1232, 1250-1251, 94 L.Ed.2d 472].) Although

containing facially absolute language, the proscription of "any" impairment contained in the contract clauses must be interpreted to accommodate the inherent police power of the state to safeguard the vital interests of its residents. (*Energy Reserves Group v. Kansas Power & Light* (1983) 459 U.S. 400, 410 [103 S.Ct. 697, 703-704, 74 L.Ed.2d 569] (*Energy Reserves*); *United States Trust Co. v. New Jersey* (1977) 431 U.S. 1, 21 [97 S.Ct. 1505, 1517, 52 L.Ed.2d 92] (*United States Trust*); *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 305 [152 Cal.Rptr. 903, 591 P.2d 1].) "[A] finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution.

██ In the instant case, as in *Blaisdell* [*Home Bldg. & Loan Assn. v. Blaisdell* (1934) 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481]], we must attempt to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power,' [citation], necessarily reserved by the States to safeguard the welfare of their citizens. [Citation.]" (*United States Trust, supra,* 431 U.S. at p. 21 [97 S.Ct. at p. 1517].)

██ A total prohibition of previously authorized conduct, as would occur with application of Proposition E to the Macpherson project, is not necessarily unconstitutional. "This Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment. [Citation.] . . . [¶] . . . Thus, a state prohibition law may be applied to contracts for the sale of beer that were valid when entered into, [citation], a law barring lotteries may be applied to lottery tickets that were valid when issued, [citation], and a workmen's compensation law may be applied to employers and employees operating under pre-existing contracts of employment that made no provision for work-related injuries [citation]." (*Exxon Corp. v. Eagerton* (1983) 462 U.S. 176, 190-191 [103 S.Ct. 2296, 2305-2306, 76 L.Ed.2d 497], fns. omitted.)

Appropriate accommodation of these competing constitutional interests begins with two threshold questions: First, is the government regulation at issue (Proposition E) a legitimate exercise of the City's police power? If not, the measure is invalid, and its impact on Macpherson need not be addressed. (See *Interstate Marina Development Co. v. County of Los Angeles* (1984) 155 Cal.App.3d 435, 450 [202 Cal.Rptr. 377] [law must have a real and substantial relationship to the object sought to be obtained]; *Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 22 [94 Cal.Rptr. 904] [deprivation effected by government action must be result of reasonable legislation reasonably applied].)

Second, will application of Proposition E to the Macpherson project operate as a substantial impairment of Macpherson's contract rights? (*United States Trust, supra*, 431 U.S. at pp. 20-21 [97 S.Ct. at p. 1517]; *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048, 1054-1055 [71 Cal.Rptr.2d 899].) If there is no substantial impairment, that ends the inquiry. (*United States Trust, supra*, 431 U.S. at pp. 20-21 [97 S.Ct. at p. 1517]; *Barrett v. Dawson, supra*, 61 Cal.App.4th at pp. 1054-1055.) If there is a substantial impairment of contract rights, however, we must determine whether the means chosen to implement the regulation is "of a character appropriate" to its legitimate public purpose. (*United States Trust, supra*, 431 U.S. at p. 22 [97 S.Ct. at p. 1518]; *Energy Reserves, supra,* 459 U.S. at p. 412 [103 S.Ct. at pp. 704-705]; *Barrett v. Dawson, supra,* 61 Cal.App.4th at p. 1055.)

### a. *Proposition E is a legitimate exercise of the City's police power.*

Enactment of a city ordinance prohibiting exploration for and production of oil, unless arbitrary, is a valid exercise of the municipal police power. "It must be deemed to be well settled that the enactment of an ordinance which limits the owner's property interest in oil bearing lands located within the city is not of itself an unreasonable means of accomplishing a legitimate objective within the police power of the city." (*Beverly Oil Co. v. City of Los Angeles* (1953) 40 Cal.2d 552, 558 [254 P.2d 865]; accord, *Pacific Palisades Assn. v. City of Huntington Beach* (1925) 196 Cal. 211, 217 [237 P. 538, 40 A.L.R. 782] [city has "the unquestioned right to regulate the business of operating oil wells within its city limits, and to prohibit their operation within delineated areas and districts, if reason appears for so doing"].)

Proposition E was adopted with general findings that reinstituting the total ban on oil drilling and production in a densely populated urban area is necessary to preserve the environment, as well as to protect the public health, safety and welfare of people and property within Hermosa Beach. It is, therefore, presumptively a justifiable exercise of the City's police power. (*Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41] [upholding constitutionality of ordinance prohibiting all oil and gas exploration on tidelands]; *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 550 [48 Cal.Rptr.2d 778, 907 P.2d 1324]; *Beverly Oil Co. v. City of Los Angeles, supra,* 40 Cal.2d at pp. 558-560.) Indeed, none of the parties disputes the validity of reinstituting the total ban

on oil drilling within Hermosa Beach, save only for the question whether that ban can be applied to the Macpherson project.[13]

 b. *The Macpherson-City lease agreement anticipates regulatory change impacting the project.*

Macpherson concedes, as it must, that it would have no basis for asserting that Proposition E unconstitutionally impairs its contract rights if the lease agreement explicitly provided that the City could prohibit all oil drilling in the future, including at the City Yard Site. (See *Energy Reserves, supra,* 459 U.S. at p. 411 [103 S.Ct. at p. 704] ["state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment"].) Macpherson also concedes that "the City expressly reserved its right to exercise its police power in the express language of the Oil and Gas Lease." In describing this aspect of the lease agreement as "routine" and "generic," Macpherson incorrectly trivializes a highly relevant statement of the parties' expectations. (See *El Paso v. Simmons* (1965) 379 U.S. 497, 515 [85 S.Ct. 577, 587, 13 L.Ed.2d 446]; see generally Tribe, American Constitutional Law (2d ed. 1988) § 9-9, p. 617 [at stake is not only what parties in fact expect but also what they are entitled to expect].)

The 1992 lease, like its predecessor, specifically provides that "[t]he Lessee shall comply with all laws, rules and regulations of the United States, of the State of California and its political subdivisions, and of the City of Hermosa Beach applicable to the Lessee's operations . . . ." The Macpherson-City lease additionally requires Macpherson to apply for and obtain "all necessary drilling and well permits from the City of Hermosa Beach pursuant to the Hermosa Beach Municipal Code."

The Hermosa Beach Oil Code, adopted in 1985 prior to the first Macpherson-City lease, both requires a drilling permit and conditions issuance of a permit on a finding that the proposed permit is "in compliance with all applicable laws, ordinances and regulations." (Hermosa Beach Mun. Code, § 21A.2.3.) By its express mandate that Macpherson obtain a drilling permit, the lease thus incorporates this further command that the Macpherson project operate in compliance with then existing law. (See *Marina Plaza v. California Coastal Zone Conservation Com.* (1977) 73 Cal.App.3d 311, 324 [140 Cal.Rptr. 725] [interpreting similar language to require compliance with both existing and future law affecting development of Marina Del Rey].) In

---

[13]The significance of the public purpose served by a regulation is also relevant to the court's determination whether the means chosen to implement it is reasonable. (See *Energy Reserves, supra,* 459 U.S. 400, 412 [103 S.Ct. 697, 704-705].)

addition, one of the conditions of the CUP issued in 1993, to which Macpherson agreed, was that "[t]he subject property shall be developed, maintained and operated in full compliance with the conditions of this grant and any law, statute, ordinance or other regulation applicable to any development or activity on the subject property."

The significance of these lease provisions and the related aspects of the Municipal Code and the CUP must also be viewed against the backdrop of pervasive governmental regulation to which the oil exploration industry has in the past been subjected (including, most particularly, by the City itself). "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. [Citation.]" (*Energy Reserves, supra,* 459 U.S. 400, 411 [103 S.Ct. 697, 704].) As this division observed in upholding a rent control ordinance in *Interstate Marina Development Co. v. County of Los Angeles, supra,* 155 Cal.App.3d at page 447, "it is not as if the governmental entity has entered a field it had never before sought to regulate." Such past governmental regulation of business is "[a]nother factor indicating the reasonableness of the measure." (*Ibid.*)

In stark contrast to the parties' explicit and repeated recognition of the City's authority to regulate the project in the future, Macpherson could have negotiated for protection from the adverse situation it now confronts, but it did not.[14] First, Macpherson failed to bargain for a lease provision imposing on the City the risk of a performance-defeating change in the law. "With the trend toward greater governmental regulation . . . *parties are increasingly aware of such risks,* and a party may undertake a duty that is not discharged by such supervening governmental actions . . . . Such an agreement is usually interpreted as one to pay damages if performance is prevented . . . ." (Rest.2d Contracts, § 264, com. a, p. 331, italics added.) "Contracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows." (*United States v. Winstar Corp.* (1996) 518 U.S. 839, 869 [116 S.Ct. 2432, 2452, 135 L.Ed.2d 964] (lead opn. of Souter, J.) [holding United States liable in damages for breach of contract based on congressional change to regulatory capital requirements for thrifts].) "The answer to the Government's contention that the State cannot barter away certain elements of its sovereign power is that a contract to adjust the risk of subsequent legislative change does not strip the Government of its legislative sovereignty." (*Id.* at p. 889 [116 S.Ct. at p. 2462], fn. omitted.)

---

[14]Macpherson does assert it would not have entered into the lease agreement had it understood the City intended to reserve the ability to terminate the project through future regulation (as opposed, presumably, merely to modifying it).

Second, after the lease agreement was completed, Macpherson could have protected itself from subsequent regulatory changes by insisting that the City enter into a development agreement pursuant to Government Code section 65864 et seq. Such agreements, which a city may enter with "any person having a legal or equitable interest in real property for the development of the property" (Gov. Code, § 65865, subd. (a)), are intended "to encourage multiphase developments by reducing the risk of subsequent regulatory changes." (*National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1521 [50 Cal.Rptr.2d 339].) The development agreement may include conditions and requirements for subsequent discretionary acts, but "shall not prevent development of the land for the uses and to the density or intensity of development set forth in the agreement." (Gov. Code, § 65865.2.) The agreement, in effect, "allows 'a builder to acquire by contract the equivalent of a vested right at an early stage of the project.' [Citation.]" (*Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1213 [66 Cal.Rptr.2d 102].)

Of course, it is likely that the City would have demanded additional consideration from Macpherson for either a risk-adjustment provision in the lease agreement or a separate development agreement. Having at least implicitly decided to forego such protection against future regulatory change, Macpherson must accept the consequences of its judgment to do so.

As discussed previously, Macpherson also did not proceed far enough with the proposed project to acquire vested rights that would permit it to continue with oil exploration and production notwithstanding Proposition E's change in the law.

Taken together, these factors could well justify a conclusion that Proposition E did not effect any substantial impairment of the Macpherson-City lease. (See *Energy Reserves, supra,* 459 U.S. at p. 416 [103 S.Ct. at p. 707], fn. omitted ["[T]he contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law. This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim"]; *Interstate Marina Development Co. v. County of Los Angeles, supra,* 155 Cal.App.3d at p. 448 [general lease provision making lessees subject at all times to ordinances of the county "arguably" authorizes adoption by county of rent control law subsequent to entry into lease agreement as simple matter of contract interpretation].) At the very least, they strongly support upholding the reasonableness, and thus the validity, of Proposition E. (*Interstate Marina Development Co., supra,* 155 Cal.App.3d at p. 447.)

### c. The appropriate level of deference for review of the government's exercise of its "reserved police powers."

#### i. United States Trust and the application of the reserved powers doctrine to public contracts.

The foundation for modern contract clause jurisprudence is *United States Trust, supra*, 431 U.S. 1, a 1977 United States Supreme Court decision that, for the first time in nearly 40 years, overturned a state law as violating the contract clause.[15] In *United States Trust* the court invalidated the repeal of a bistate statutory covenant that limited the ability of the Port Authority of New York and New Jersey to subsidize rail passenger transportation from revenues and reserves pledged as security for consolidated bonds issued by the port authority, holding this retroactive alteration of the contract rights of state bondholders to be an impermissible impairment of contract. ▮ "[T]he Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation. . . . [¶] . . . [¶] . . . Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying it adoption. [Citation.]" (*United States Trust, supra*, 431 U.S. at pp. 21-22 [97 S.Ct. at pp. 1517-1518].)

In revitalizing the contract clause as a limitation on state legislative authority, the Supreme Court drew two crucial distinctions that bear heavily on the proper analysis of the constitutionality of a state or local law. First, the court differentiated between the *object* of the legislation: Laws affecting existing contractual relationships between private parties, as opposed to laws affecting obligations of the state itself, are to be reviewed with great deference to the legislature's judgment as to the necessity and reasonableness of a particular measure. (*United States Trust, supra*, 431 U.S. at pp. 22-23 [97 S.Ct. at pp. 1517-1518].) Second, and of paramount significance for the case at bar, the Supreme Court confirmed the continued viability of the "reserved-powers doctrine" and sharply distinguished between impairment of a state's own financial obligation through exercise of the taxing and spending powers, on the one hand, and abridgment of rights in a contract to which the state may be a party as a result of the state's exercise of its police

---

[15]Our Supreme Court and the various Courts of Appeal do not differentiate between the federal and state contract clauses in their analysis, and the opinions draw primarily from United States Supreme Court cases. (See, e.g., *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 826-831 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Sonoma County Organization of Public Employees v. County of Sonoma, supra*, 23 Cal.3d at pp. 307-309; *Barrett v. Dawson, supra*, 61 Cal.App.4th at p. 1056.)

powers (for example, for health or safety reasons), on the other hand. *(Id.* at pp. 23-25 [97 S.Ct. at pp. 1518-1519].)

"It is often stated that 'the legislature cannot bargain away the police power of a State.' [Citation.] This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty. [¶] In deciding whether a State's contract was invalid *ab initio* under the reserved-powers doctrine, earlier decisions relied on distinctions among the various powers of the State. Thus, the police power and the power of eminent domain were among those that could not be 'contracted away,' but the State could bind itself in the future exercise of the taxing and spending powers. *Such formalistic distinctions perhaps cannot be dispositive, but they contain an important element of truth.*" (*United States Trust, supra,* 431 U.S. at pp. 23-24 [97 S.Ct. at p. 1518], fns. omitted, italics added.)

After observing that the bonds at issue were plainly state financial obligations and that repeal of the security provisions protecting the bondholders was an exercise of the state's financial powers, rather than its reserved police powers, the court illustrated the difference between the two situations: "The instant case involves a financial obligation and thus as a threshold matter may not be said automatically to fall within the reserved powers that cannot be contracted away. Not every security provision, however, is necessarily financial. For example, *a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons.*" (*United States Trust, supra,* 431 U.S. at pp. 24-25 [97 S.Ct. at p. 1519], fn. omitted, italics added.)

Only after it concluded that the impairment of the bondholder's financial rights did not involve an exercise of the state's core governmental power to protect the health or safety of its citizens did the Supreme Court articulate the oft-quoted standard for evaluating the constitutionality of a measure impacting a public contract: "The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a

use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (*United States Trust, supra,* 431 U.S. at pp. 25-26 [97 S.Ct. at p. 1519], fn. omitted.)[16]

 Following *United States Trust,* therefore, a court reviewing a contract clause challenge involving a public contract must consider what powers the state has invoked in adopting the legislation—that is, the nature of the statutory impairment. If the legislation has been enacted pursuant to the state's reserved police powers, rather than its taxing and spending powers, traditional standards of deference to the legislature's judgment in economic and social matters must be observed. (See *United States Trust, supra,* 431 U.S. at pp. 24-25 [97 S.Ct. at pp. 1518-1519]; see generally Note, *Takings Law and the Contract Clause: A Takings Law Approach to Legislative Modifications of Public Contracts* (1984) 36 Stan. L.Rev. 1447, 1455-1456.)

ii. *Stone v. Mississippi, Beer Company v. Massachusetts and the relevant California decisions.*

*United States Trust*'s distinction between the deference to be accorded state laws impacting its own financial obligations and those affecting private contracts has been noted in subsequent Supreme Court cases involving private contracts. (E.g., *Keystone Bituminous Coal Assn. v. DeBenedictis, supra,* 480 U.S. at pp. 505-506 & fn. 33 [107 S.Ct. at p. 1252]; *Exxon Corp. v. Eagerton, supra,* 462 U.S. at p. 192 & fn. 13 [103 S.Ct. at p. 2306]; *Energy Reserves, supra,* 459 U.S. at pp. 412-413 & fn. 14 [103 S.Ct. at pp. 704-705].)[17] The court has not directly considered a public contract case involving legislation adopted pursuant to the state's police powers since 1977, and thus has had no occasion to focus again on the distinction between the state's exercise of its spending and taxing powers and an exercise of its core governmental authority. In *United States v. Winstar Corp., supra,* 518 U.S. at page 888 [116 S.Ct. at page 2461] (lead opn. of Souter, J.), however, the court did explicitly refer to *United States Trust*'s analysis of the reserved powers doctrine and once again confirmed that doctrine's "limitation on the scope of the Contract Clause."

---

[16]This standard of review for legislation impairing a state's own financial obligations articulated in *United States Trust* has been likened to the "intermediate" level of scrutiny in modern sex discrimination cases. (Gunther, Constitutional Law (12th ed. 1991) p. 484, fn. 2.)

[17]It has been suggested that these more recent decisions, all of which have *upheld* the challenged state legislation, presage at least a partial return to greater deference by the Supreme Court. (Gunther & Sullivan, Constitutional Law (13th ed. 1997) pp. 514-515; Tribe, American Constitutional Law, *supra,* § 9-11, p. 623.)

Substantial deference to the legislative judgment of reasonableness and necessity for laws enacted pursuant to the state's reserved powers, recognized in *United States Trust,* is a continuation of the Supreme Court's historic approach to contract clause cases involving public contracts. For example, in *Stone v. Mississippi* (1879) 101 U.S. 814 [25 L.Ed. 1079], the Supreme Court permitted prosecution of a state-chartered corporation for conducting a lottery in violation of state law even though the company's charter, issued before the law was enacted, expressly authorized that activity. In reaching its conclusion, the court made the identical distinction found in *United States Trust* between a public contract impacted by a state's exercise of its police powers and one involving use of its revenue and spending powers. The court first noted that the law at issue was an appropriate exercise of the state's police powers: "When the government is untrammeled by any claim of vested rights or chartered privileges, no one has ever supposed that lotteries could not lawfully be suppressed . . . ." (*Id.* at p. 818 [25 L.Ed. at p. 1080].) The court then dismissed the corporation's claim that its corporate charter was a contract with the state that was impermissibly impaired by the law banning lotteries, holding that "[t]he contracts which the Constitution protects are those that relate to property rights, not governmental." (*Id.* at p. 820 [25 L.Ed. at pp. 1080-1081].) "We have held . . . that this clause [the contract clause] protected a corporation in its charter exemptions from taxation. . . . [¶] But the power of governing is a trust committed by the people to the government, no part of which can be granted away. . . . They may create corporations, and give them, so to speak, a limited citizenship; but as citizens, limited in their privileges, or otherwise, these creatures of the government creation are subject to such rules and regulations as may from time to time be ordained and established for the preservation of health and morality." (*Ibid.* [25 L.Ed. at p. 1080].)

Similarly, in *Beer Company v. Massachusetts* (1877) 97 U.S. 25 [24 L.Ed. 989], the Supreme Court upheld Massachusetts's right to enact a law prohibiting the manufacture and sale of liquor in the state notwithstanding its prior grant of a charter entitling plaintiff to manufacture and sell malt liquors. "[A]lthough [the right to manufacture and sell malt liquor] was thus granted in the most unqualified form, it cannot be construed as conferring any greater or more sacred right than any citizen had to manufacture malt liquor; nor as exempting the corporation from any control therein to which a citizen would be subject, if the interests of the community should require it. If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. *All rights are held subject to the*

*police power of the State."* (*Id.* at p. 32 [24 L.Ed. at pp. 991-992], italics added.)

Both *Stone* and *Beer Company* were cited in 1983 by a unanimous Supreme Court in *Exxon Corp. v. Eagerton* for examples of general regulatory measures that withstood contract clause challenges notwithstanding that contract rights were "impaired, or even destroyed, as a result." (*Exxon Corp. v. Eagerton, supra,* 462 U.S. at pp. 190-191 [103 S.Ct. at pp. 2305-2306]; see *United States v. Winstar Corp., supra,* 518 U.S. at p. 888 [116 S.Ct. at p. 2461] [citing *Stone v. Mississippi, supra,* 101 U.S. 814 as "classic example" of reserved powers doctrine's limitation on the scope of the contract clause].)

California courts have likewise long recognized the reserved powers doctrine as a limit on the protection afforded public contracts by the contracts clause. In *Laurel Hill Cemetery v. City and County of San Francisco* (1907) 152 Cal. 464 [93 P. 70], the California Supreme Court denied a constitutional challenge brought by a cemetery association to an ordinance prohibiting interments within San Francisco's city limits. The association argued, in part, that the land it owned had been granted to it by the city and county for the express purpose of operating a cemetery and that the government was therefore precluded from enforcing the ordinance against it. (*Id.* at p. 475.) The court rejected this argument: "Even if the city and county had made an express contract granting to the plaintiff the right to make interments in this ground in perpetuity, such contract would have no force as against a future exercise by the legislative branch of the government of its police power. [Citation.] This power cannot be bargained or contracted away, and all rights and property are held subject to it. [Citations.]" (*Ibid.*)

In *Teachers Management & Inv. Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438 [134 Cal.Rptr. 523], the court used similar reserved-powers reasoning to reject an effort to enjoin enforcement of a measure prohibiting the City of Santa Cruz from owning, leasing, maintaining or operating a convention center on certain real property in the city. Plaintiffs argued that the ordinance impermissibly impaired contracts they had entered with the city and with the owner of the property for development of the site. The court disagreed, holding that "the people of Santa Cruz were not powerless to act through the initiative to change a policy of their city. [Citation.] The existence of binding agreements cannot prevent a public entity from abandoning or rescinding its plans to proceed with a public works project, although the change in policy may result in the entity's being liable for breach of contract. [Citation.]" (*Id.* at p. 448.)

The distinction for contract clause purposes between the exercise of the state's taxing and spending powers and its core governmental authority is

also inherent in this division's analysis of the County of Los Angeles's rent control ordinance in *Interstate Marina Development Co. v. County of Los Angeles, supra,* 155 Cal.App.3d 435. Although the opinion fully considered the important public purpose served by the rental control law before concluding that the ordinance was both reasonable and necessary (*id.* at pp. 446-448), citing *to United States Trust* the court also emphasized that the law furthered "a broad legitimate purpose that is within the police power" (*id.* at p. 448) and was not simply a device by which the county could avoid its financial obligations. "The state cannot use the police power to avoid meeting its financial obligations. [Citation.] However, that is not the situation we are faced with here. The County is not attempting to repudiate debts it has incurred under a contract. It is using the power to achieve the legitimate purpose of promoting the welfare of its people." (*Ibid.*)

 iii. *Macpherson concedes that Proposition E is an exercise of the City's reserved powers.*

████ Macpherson acknowledges, as it must, the case law delineating the reserved powers doctrine and agrees that the City expressly retained in the language of the lease agreement itself the right to exercise its police powers in the future, including adoption and enforcement of new laws regulating oil drilling. Macpherson, however, attempts to dismiss the significance of this concession by imposing a cramped and wholly unsupportable interpretation on the Supreme Court's discussion of the reserved powers doctrine in *United States Trust.*

Focusing on only a portion of the language used, Macpherson correctly observes that the Supreme Court stated the "initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. . . . [T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." (*United States Trust, supra,* 431 U.S. at p. 23 [97 S.Ct. at p. 1518].) From this language Macpherson makes the peculiar argument that the only significance of the reserved powers doctrine is that it, in essence, requires language in all public contracts (elsewhere described by Macpherson as "generic") expressly acknowledging that the private contracting party may be subject to laws or regulations adopted in the future. If no such provision exists, the contract is void; if the contract contains the requisite statement, the reserved powers doctrine plays no further role in analyzing the validity of the government regulation under the contract clause. According to Macpherson, because its lease with the City does not purport to restrict the City from exercising its police power, "the reserved powers doctrine does not operate

to diminish the standard constitutional protections afforded private citizens when those private citizens enter into a contract with the government."

The reserved powers doctrine is neither so simplistic nor so mechanical. As discussed above, the "initial inquiry" to which the court refers in *United States Trust* concerns the nature of the governmental power being exercised, not whether the contract does or does not contain specific language that acknowledges the possibility of future regulation.[18] If the legislation at issue falls within the ambit of traditional police powers, further inquiry into the purpose or reasonable of the legislation is circumscribed. (*United States Trust, supra,* 431 U.S. at p. 23 [97 S.Ct. at p. 1518].) If, on the other hand, the government is exercising revenue or spending powers, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate . . . ." (*Id.* at p. 26 [97 S.Ct. at p. 1519].)

Like the legislation banning lotteries and prohibiting the manufacture and sale of liquor at issue in *Stone* and *Beer Company* and the hypothetical closure of the port facility for health or safety reasons considered in *United States Trust* (*United States Trust, supra,* 431 U.S. at p. 25 [97 S.Ct. at p. 1519]), Proposition E's reinstatement of the ban on oil drilling and production in Hermosa Beach is an exercise by the voters of Hermosa Beach of traditional police powers. As was true of the County in *Interstate Marina Development Co. v. County of Los Angeles, supra,* 155 Cal.App.3d 435, the City "is not attempting to repudiate debts it has incurred under a contract. It is using the power to achieve the legitimate purpose of promoting the welfare of its people." (*Id.* at p. 448.)

### d. *Proposition E uses reasonable and necessary means for implementing its important public purpose.*

Proposition E was adopted pursuant to the City's police power to protect the public health and safety of the residents of Hermosa Beach. Pursuant to the authority discussed in the preceding sections of this opinion, in determining whether application of the measure to the Macpherson project impermissibly impairs Macpherson's contract rights, we properly show substantial deference to the legislative judgment made by the voters that restoration of the complete ban on oil drilling and exploration is necessary and reasonable. (*United States Trust, supra,* 431 U.S. at pp. 23-24 [97 S.Ct. at pp. 1518-1519].)

---

[18]Whether or not a public contract contains language expressly reserving the government's right to exercise its police powers, the significance of the reserved powers doctrine is precisely that the government always retains the right to do so. (E.g., *United States Trust, supra,* 431 U.S. at p. 25 [97 S.Ct. at p. 1519]; *Beer Company v. Massachusetts, supra,* 97 U.S. at pp. 31-32 [25 L.Ed. at pp. 991-992].)

i. *Significant health and safety concerns support application of Proposition E to the Macpherson project.*

A substantial body of evidence was introduced in the trial court concerning the health and safety risks of the project proposed by Macpherson for the City Yard Site. That evidence, much of which was also presented to the SLC, the Coastal Commission and the City itself, is more than sufficient to uphold the validity of Proposition E.

The EIR certified by the City acknowledges numerous adverse impacts from the proposed project: noise; air pollution from dust, exploratory drilling and production operations; odors; degradation of visual resources and aesthetics; and increases in traffic. With respect to safety issues, the EIR stated, "Several potential public safety and health hazards can be associated with oil drilling and production activities. Among these are accidents resulting from geologic hazards, pranks and trespassing, blowouts, truck traffic, gas leaks, fires and explosions, and spills or ruptures."

As supplemented through 1993 when the City issued the CUP, the EIR concluded that the project created safety concerns that could not be fully resolved but that nonetheless presented an acceptable level of risk. "The proposed project will increase the potential and severity of an accident occurring on-site. The hazard footprint radius will extend into adjacent residential and industrial land use. The safety measures included and required for the project will reduce the level of risk, *although the risk will not be completely mitigated.*"[19] (Italics added.)

Not satisfied with the EIR's analysis of the risk associated with the gas hazards at the project, the Coastal Commission imposed new mitigation requirements in 1998 following an independent review by consultant Arthur D. Little, Inc., working under the direction of the commission's staff. In its January 1998 findings, the Coastal Commission explained, "Commission staff did not believe the applicant had fully analyzed the potential worst-case accidental release of hydrogen sulfide that might occur. In addition, some nearby wells have historically produced significant amounts of hydrogen sulfide. [The Arthur D. Little report] determined that hydrogen sulfide, an

---

[19]As to gas hazards, the EIR explained that "[a] certain volume of methane gas is normally produced along with the oil. . . . The production tank vapors are expected to be primarily comprised of methane gas with smaller quantities of low molecular weight hydrocarbons (ethane, propane and butane) and possibly trace quantities of hydrogen sulfide gas. The latter, if allowed to vent directly to the atmosphere, could create a fire hazard and odor nuisance impact. By collecting, treating and consuming or selling these production tank vapors, along with the primary well head gas, no significant odor or safety problems will exist."

acutely toxic gas, could be encountered during drilling and/or production and could pose a significant safety risk to offsite populations."[20] As a result, the commission required that wells producing more than 40 parts per million (ppm) of the gas be re-completed to avoid the gas or be permanently shut in. The commission further required that Macpherson not attempt to treat hydrogen sulfide gas and that Macpherson maintain a perimeter detection and alarm system. The Arthur D. Little report and the Coastal Commission both ultimately concluded that the risk from hydrogen sulfide levels would be minimal if the mitigation measures, including those first required in 1998, were successful in maintaining levels at no more than 40 ppm.

The Arthur D. Little report also found a significant risk of fire and explosion hazard. "[P]otential fire and explosion hazards associated with the proposed project, especially given the location in close proximity to residential areas, would still be classified as a significant impact based on the generally accepted risk criteria used by the applicant." The report recommended a further, detailed hazard and operability study. The Coastal Commission's approval of the development permit was conditioned on the preparation of such a study, which was to be submitted for approval to the commission's executive director.

As discussed above, in connection with the hazard analysis required by the Coastal Commission, the City authorized an independent review and risk assessment of the project by the Aspen/Bercha Group. The Aspen/Bercha report projected as "ultimate risk expectations" over the 35-year life of the project: "31 leaks, 2 major releases, and 1 rupture within the process segment"; "[r]esulting offsite hazards including 2 jet fires, and a 4% likelihood of an offsite flash fire with potential for casualties"; and a "1 in 7000 chance of 1 of [*sic*] more fatalities, 1 in 30,000 of 10 or more, and a 1 in 700 chance of 1 or more serious injuries of members of the public."

As to the ultimate acceptability of the risks that would be created, the Aspen/Bercha report recognized that weighing those risks against the anticipated financial benefits of the project was ultimately a political judgment. "In general, it can be said that the proposed project by a safe and reputable operator contains industry standard safety and reliability provisions, which will make it as safe as any comparable modern operation. Yet, because of its setting in a medium-density urban, commercial, and residential location, it

---

[20]According to the Arthur D. Little report, "Hydrogen sulfide is lethal within a few breaths at concentrations of 1,000 parts per million (ppm), and kills within 1/2-hour at concentrations of 300 ppm. Injuries may occur at lower concentrations and occupational safety standards are triggered at 10 ppm."

poses risks. These risks have been quantified and presented, with an explanation of the approximations implicit in this quantification, and compared to standards and other measuring sticks that are available. The ultimate decision on the acceptability of the risks rests with the City of Hermosa Beach."

In light of the evidence that the dangers posed cannot be mitigated to a level of insignificance, the voters' judgment that the health and safety risks associated with the Macpherson project required prohibition of all oil drilling and production within Hermosa Beach is reasonable. (See *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 282 [17 Cal.Rptr.2d 845] ["an initiative measure ordinarily must be deemed to have been enacted on the basis of any state of facts supporting it that reasonably can be conceived"]; see also *Higgins v. City of Santa Monica, supra,* 62 Cal.2d at p. 30 [upholding constitutionality of ordinance prohibiting all oil and gas exploration on the Santa Monica tidelands].) The propriety of that determination is significantly reinforced by Macpherson's repeated acknowledgement that, until oil drilling permits are actually issued by the City, operation of the project is subject to all future changes in the law. (*Interstate Marina Development Co. v. County of Los Angeles, supra,* 155 Cal.App.3d at p. 447.)

> ii. *The trial court utilized an erroneous legal standard to evaluate the reasonableness of Proposition E.*

The trial court's contrary conclusion that Proposition E impermissibly impairs the Macpherson-City lease agreement is based on two interrelated rulings, both of which are erroneous. First, the trial court apparently evaluated the justification for Proposition E under a "compelling interest" or "strict scrutiny" standard. Second, the trial court disregarded health and safety information that had been presented in prior administrative and judicial proceedings. "The record fails to demonstrate a sufficient basis to justify Proposition E's impairment of the McPherson [*sic*] lease. The lease contemplates that the permits required under its provisions be issued or denied upon consideration of the merits attendant to the activities contemplated. Most of these factors have either been aired, addressed and adjudicated in favor of the lease in proceedings which have long since become final, or are addressed in the 140 odd conditions which McPherson [*sic*] must satisfy in order to commence drilling. Plaintiffs have not demonstrated any compelling or valid basis upon which the 'City voters' 'legitimately exercised their police power for the protection of their hea[l]th, safety and welfare,' not previously determined in favor of the lease in the prior proceedings. I[t] seems quite clear that Proposition E was passed precisely because the opposition there failed."

With respect to the standard of review, as discussed at some length above, because Proposition E is a legitimate exercise of the City's reserved police powers, rather than an exercise of its revenue and spending powers, the legislative judgment of reasonableness and necessity made by the voters must be accorded the deference traditionally shown by courts to social and economic legislation. (*United States Trust, supra,* 431 U.S. at pp. 23-24 [97 S.Ct. at pp. 1518-1519].) Even were we to evaluate Proposition E under a less deferential standard of review, however, there would be no warrant for utilizing the "strict scrutiny" standard advocated by Macpherson and employed by the trial court that virtually ensures legislation will be invalidated.

Analyzing and applying the United States Supreme Court's decision in *United States Trust,* our Supreme Court in *Sonoma County Organization of Public Employees v. County of Sonoma, supra,* 23 Cal.3d 296, a case involving an attempt to limit public employees' contractual right to wage increases, explained that the contract clause was not an absolute bar to subsequent modification of a state's financial obligations. (*Id.* at p. 308.) In determining whether such a modification is justified, the court reiterated the language of *United States Trust* that "complete deference to a legislative assessment of reasonableness and necessity is not required because the government's self-interest is at stake." (*Ibid.*) The absence of "complete deference," however, is a far cry from the complete absence of deference advocated by Macpherson. Rather, as articulated in *Sonoma County Organization of Public Employees,* what is required is a "careful examination" of the nature and purpose of the legislation.[21] (*Id.* at p. 309; accord, *Allied Structural Steel Co.*

---

[21]We recognize that another division of this district in *United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095 [259 Cal.Rptr. 65], indicated that, to be upheld, legislative impairment of a public contract "requires a 'compelling state interest,' as well as necessity." (*Id.* at p. 1111.) The local charter amendment at issue in that case, however, attempted to limit public employees' pension rights, and thus involved the exercise of revenue and spending powers, not police powers. (*Id.* at p. 1102; see *Sonoma County Organization of Public Employees v. County of Sonoma, supra,* 23 Cal.3d at p. 308.) Moreover, the United States Supreme Court decision cited in the *United Firefighters* opinion as mandating application of a "compelling interest" standard neither employs "strict scrutiny" or "compelling state interest" language nor otherwise supports use of that most demanding standard of review. Instead, that case, like the California Supreme Court opinion in *Sonoma County Organization of Public Employees,* speaks only of "a careful examination," "[e]valuating with particular scrutiny" and a "more stringent examination under the Contract Clause than would [be used for] laws regulating contractual relationships between private parties." (*Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at pp. 244, 245 & fn. 15 [98 S.Ct. at p. 2722].)

*v. Spannaus* (1978) 438 U.S. 234, 245 [98 S.Ct. 2716, 2722-2723, 57 L.Ed.2d 727].)[22]

With respect to the evidence to be considered in evaluating the reasonableness of Proposition E, neither the trial court nor Macpherson offers any support for the view that voter adoption of an initiative measure must be based on "new" facts and cannot be justified by information previously presented to an administrative agency or to city officials. We decline to adopt and apply such a rule in this case for several reasons.

First, the Coastal Commission's consideration of the project's potential impact on the environment, including the Arthur D. Little report's evaluation of the shortcomings in the EIR's risk analysis, occurred *after* passage of Proposition E. While the commission ultimately concluded, for example, that the risk from hydrogen sulfide levels would be acceptable if the mitigation measures it imposed in 1998 were successful, when Proposition E was adopted those additional measures were not part of the proposed project. The "after-the-fact evidence" that the EIR understated the gas hazards from the proposed project is properly considered in assessing the constitutionality of Proposition E. (*City of Dublin v. County of Alameda, supra,* 14 Cal.App.4th at p. 282 ["even if a school board or city council were not permitted to rely on after-the-fact evidence to defend its fee ordinance, the trial court's imposition of such a limitation on the initiative measure here is contrary to law"].)

Second, the purpose for which information about the project was considered by the SLC in approving the tidelands lease is far narrower than the holistic evaluation appropriate for a legislature or the voters in exercising their right to adopt general land use policies for their community. (See *Higgins v. City of Santa Monica, supra,* 62 Cal.2d at p. 30; *Building Industry Assn. v. City of Camarillo, supra,* 41 Cal.3d at pp. 823-824.) The SLC concluded that "leasing of the Hermosa Beach tide and submerged lands for the production of oil and gas will be in the best interests of the State," based on its findings that additional domestic oil resources may be produced; the project will provide economic benefits both to the City and to the economy of Southern California; no oil platforms will be in the ocean, and no wells or production facilities will be on the beach; and the visual and noise impacts

---

[22]In applying what it termed "strict scrutiny" to the justification proffered for impairment of a governmental funding obligation, the Court of Appeal in *Board of Administration v. Wilson, supra,* 52 Cal.App.4th 1109 expressly limited its holding to "the public pension field." (*Id.* at p. 1155.)

would be minimal. Significantly, the SLC did not (nor was it required to) consider safety issues relating to the project.[23]

Third, when issuing the CUP, the City clearly expressed its developing concern about the safety of the project and required Macpherson to prepare additional studies for approval by city officials, specifically including oil spill and blowout prevention plans, as well as a "fire analysis." Rather than resolving the issue of the acceptability of the risks created by the project, the CUP process is properly viewed as simply deferring that issue for determination at a future time—a determination that was then made by the voters through passage of Proposition E.

Finally, even had state agencies and the City previously balanced the overall desirability of the project and the risks to health and safety associated with oil and gas production and determined to allow the project to go forward, those prior decisions should not, and do not, preclude the voters of Hermosa Beach from revisiting that question and implicitly striking a different balance. (*Teachers Management & Inv. Corp. v. City of Santa Cruz, supra,* 64 Cal.App.3d at p. 448 ["[T]he people of Santa Cruz were not powerless to act through the initiative to change a policy of their city. . . . The existence of binding agreements cannot prevent a public entity from abandoning or rescinding its plans to proceed with a public works project . . ."]; *City of Dublin v. County of Alameda, supra,* 14 Cal.App.4th at p. 282.)

Careful examination of Proposition E in light of the full record before the trial court amply demonstrates that the measure employs reasonable and necessary means to implement its important public purpose. Accordingly, we conclude that application of Proposition E to the Macpherson oil drilling project does not constitute an unconstitutional impairment of the lease agreement between Macpherson and the City.

5. *This appeal presents no issue of breach of contract.*

Each of the parties devotes a portion of its briefs to the question whether Macpherson may have a viable claim for breach of contract against the City if, as we hold, Proposition E can validly be applied to terminate the project.

That question involves several potentially difficult issues of contract interpretation, including the scope and meaning of the parties' agreement

---

[23]Macpherson quotes a December 3, 1997 letter from the chief of the mineral resources management division of the SLC to the staff of the Coastal Commission to support its assertion that the SLC considered the public health hazards associated with elevated hydrogen sulfide concentrations. That letter, however, does *not* refer to any evaluations done by the SLC in connection with its 1994 approval of the Macpherson-City lease, but to discussions and analyses apparently conducted in 1997, approximately two years after passage of Proposition E.

authorizing the City to "temporarily suspend" any aspect of the project "whenever the City finds that the operation, unless suspended, would pose an immediate and serious threat to life, health, property or natural resources," as well as Macpherson's agreement to "comply with all laws, rules and regulations . . . of the City of Hermosa Beach applicable to the Lessee's operations." (See generally *Teachers Management & Inv. Corp. v. City of Santa Cruz, supra,* 64 Cal.App.3d at p. 448 ["The existence of binding agreements cannot prevent a public entity from abandoning or rescinding its plans to proceed with a public works project, although the change in policy may result in the entity's being liable for breach of contract"]; *Lavine v. Jessup* (1958) 161 Cal.App.2d 59, 68 [326 P.2d 238] ["The right of a public body to rescind its action and abandon improvement proceedings without other liability than that flowing from a breach of contract has been recognized in various cases . . ."].)

Issues relating to the defense of impossibility are also implicated. (See Civ. Code, § 1511, subd. 1 [performance excused when prevented by the operation of law]; *Baird v. Wendt Enterprises, Inc.* (1967) 248 Cal.App.2d 52, 55 [56 Cal.Rptr. 118] ["there is no liability for breach of a contract whose performance has been made impossible by operation of law"]; but see Rest.2d Contracts, § 261, p. 313 [defense is traditionally unavailable where the barrier to performance arises from the act of the party seeking discharge].)

These matters are not before us on this appeal,[24] and we decline to speculate on their proper resolution.

### DISPOSITION

The judgment is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion, including a declaration that Proposition E was intended to and does apply to the Macpherson project and that application of Proposition E to the Macpherson project is a valid exercise of the City's police power that does not constitute an unconstitutional impairment of contract. Stop Oil is to recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied February 23, 2001, and the petition of real parties in interest for review by the Supreme Court was denied May 2, 2001. Baxter, J., was of the opinion that the petition should be granted.

---

[24]As discussed above, Macpherson filed a cross-complaint for breach of contract against the City in the underlying action in December 1998, which was severed from the proceedings on Stop Oil's complaint for declaratory and injunctive relief.