Filed 10/16/13  Continental Ins. v. Rockwell Collins CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE CONTINENTAL INSURANCE COMPANY,<br><br>Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>ROCKWELL COLLINS, INC.,<br><br>Defendant, Cross-complainant and Appellant. | B238504<br><br>(Los Angeles County<br>Super. Ct. No. BC357580) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carl J. West, Judge.  Affirmed in part, reversed in part.

Berkes Crane Robinson & Seal, Steven M. Crane, Barbara S. Hodous and Steven M. Haskell for Plaintiff, Cross-defendant and Appellant.

Alston & Bird, Ward L. Benshoof and Sarah T. Babcock for Defendant, Cross-complainant and Appellant.

_____

In this action for declaratory relief the trial court held The Continental Insurance Company had a duty to defend and indemnify Rockwell Collins, Inc. in the underlying property contamination litigation under primary liability policies issued to Collins Radio Company, a predecessor entity, from 1966 to 1973. Continental, which did not consent to assignment of its policies to Rockwell Collins, contends the court erred in concluding those policies had passed to Rockwell Collins by operation of law, as well as by defacto merger, following several decades of corporate reorganizations. We need not resolve these complex insurance coverage and corporate succession issues because Continental relinquished its right to assert this defense when it settled a dispute with Rockwell Collins over the funding of additional site investigation in the underlying contamination action.

Continental also contends the court erred in concluding it was not entitled to equitable contribution from The Travelers Indemnity Company under primary liability policies issued to Rockwell International Corporation, the company that had acquired Collins Radio in 1973. We agree and reverse the judgment to the extent it precludes Continental from seeking equitable contribution from Travelers.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Collins Radio Company; the Continental Insurance Policies; the Corporate History of Rockwell Collins*

Collins Radio developed and manufactured sophisticated communications systems. Continental issued primary liability policies to Collins Radio for the years January 31, 1966 through November 14, 1972. The policies, which provided indemnity for property damage, as defined, and defense costs, required Continental's consent for any assignment. From the early 1960's through 1971 Collins Radio operated a manufacturing facility on leased property in Santa Ana. In 1971 Collins Radio moved the manufacturing operation to a facility in Newport Beach.

In November 1973 Collins Radio merged into Rockwell International. After the merger Collins Radio ceased to exist, and its business operations were conducted as divisions of Rockwell International (Collins divisions). In 1996, as part of a complex restructuring, Rockwell International, The Boeing Company, and its wholly owned

2

subsidiary Boeing NA, Inc. agreed to merge Boeing NA, Inc. into Rockwell International; and Rockwell International divested itself of certain lines of business, including most of the operations of the Collins divisions. Several new companies were formed as part of this transaction, including New Rockwell International Corporation (New Rockwell), and its wholly owned subsidiary, Rockwell Collins, to which substantially all of the Collins divisions assets and liabilities were contributed.[1]

Although Rockwell International was the surviving corporation after the merger with Boeing, NA, Inc., the surviving corporation's name was changed to Boeing North American, Inc. On December 31, 1999 Boeing North American, Inc. was merged into The Boeing Company. In 2001 Rockwell Collins, which had been operating as a wholly owned subsidiary of New Rockwell since 1996, became independent of New Rockwell. A few months later Rockwell Collins changed its name to Rockwell Automation, Inc.

2. *The Travelers Policies*

Travelers issued insurance policies to Rockwell International for the years April 1, 1975 through October 1, 1985 in part providing coverage for property damages. Defense costs were in addition to the policy limits of $2 million per occurrence.[2] The policies for the years 1975 to 1983 were subject to reinsurance agreements between Travelers and Constantine Insurance Company, Limited of Hamilton, Bermuda, a wholly owned subsidiary of Rockwell International,[3] requiring Constantine, with a limited exception, to reimburse Travelers for 95 percent of all incurred costs, including defense costs.[4] In 1990

---

[1]     New Rockwell eventually changed its name to Rockwell International Corporation. For clarity, we refer to the original Rockwell International by that name and continue to identify this entity as New Rockwell.

[2]     Because the policies had a pollution exclusion, Continental's claim for contribution in this proceeding is limited to defense costs.

[3]     Constantine reinsured approximately 30 insurance companies including companies that had issued policies for entities unrelated to Rockwell International.

[4]     For the period April 1, 1975 through April 1, 1976 Constantine was obligated to reimburse Travelers for 95 percent of the first $250,000 of each claim and 90 percent of each incurred claim in excess of $250,000.

these reinsurance agreements were extinguished pursuant to the terms of a commutation agreement between Constantine and Travelers.

The calculation of the Travelers policy premiums was complicated. The policies themselves provided the premiums set forth in the declarations were "deposit premium[s]. Upon each anniversary of [the] policy and upon termination of the policy, the earned premium shall be computed in accordance with the company's rating plan specifically applicable to [the] policy." "Premium computation endorsement[s]" issued in connection with the policies set forth the components of the premium: a fixed basic premium; incurred losses defined as "the actual paid losses, the reserve as estimated by the company for unpaid losses, and allocated loss expense as of the computation dates"; and "unallocated loss adjustment expense, other company expense and tax computed at" percentages ranging from 19 to 27 percent of incurred losses. The premium computation endorsements provided for minimum and maximum premiums and stated the "initial computation of annual cost" for a period would be "based upon incurred claims valued as of" a future period. For example, for the period April 1, 1977 to April 1, 1978 the minimum premium was $7,133,000 and the maximum premium was $10,700,000 and the initial computation of annual cost was to "be based upon incurred claims valued as of October 1, 1981 and will be made as soon as practicable thereafter."[5] However, sometime prior to March 1990 the minimum and maximum premiums were eliminated through the issuance of new premium computation endorsements.

In 1992 Rockwell International sued more than 40 insurance companies, including Travelers, for declaratory relief and breach of contract, alleging the insurance companies had breached their duty to defend it in various environmental contamination cases. In

---

[5]     Although most of the premium computation endorsements were not dated, James Perino, Rockwell International's director of insurance and risk management in 1985, testified, "There was always a premium computation endorsement from the very beginning." Nonetheless, at least two endorsements appear to have been created after the policy period to which they apply. For example, the endorsement for the period October 1, 1982 to October 1, 1983, which has a "date of issue" of October 18, 1982, includes a footer that says "Revised 2-10-84."

1994 Travelers and Rockwell International settled the case. The settlement agreement provided Travelers would make a payment to Rockwell International, Rockwell International would reimburse Travelers for 100 percent of any defense and indemnity payments made by Travelers for environmental damage suits as defined in the agreement, which included future claims; and Rockwell International would pay any judgments or settlements against Travelers for equitable contribution claims made in connection with environmental damage suits under the Travelers policies.

3. *The Lawsuit for Contamination of the Santa Ana Property; the Agreement To Fund Further Investigation of the Property;*

In 1988 real estate developer Grove Investment purchased the Santa Ana property. In May 2001, several years after discovering the Santa Ana property was contaminated with industrial solvents, Grove Investment filed an action in federal court alleging 13 causes of action against Collins Radio, Rockwell International, Rockwell Collins, Rockwell Collins Technologies, LLC (Rockwell entities) and others. The complaint alleged the contamination was due in part to the manufacturing activities of Collins Radio and asserted claims under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9607 et seq.), the Resource Conservation Recovery Act (42 U.S.C. § 6972) and several state law theories. The complaint included a brief description of the corporate history of Rockwell Collins and alleged the various corporate entities identified were all "successors-in-interest to any and all legal liabilities incurred by Collins Radio at the Site."

In November 2001 Rockwell Collins tendered the defense of the Grove Investments action to Continental. In a July 9, 2002 letter Continental accepted "under a full reservation of rights as stated" in the letter, which described several defenses to coverage based on policy exclusions. The letter also warned, "Since [Continental] may not be privy to all of the facts and circumstances surrounding Collin's [*sic*] involvement in this matter, we must also reserve the right to disclaim coverage for the same based upon any additional or alternative bases should the results of our investigation or review of further facts indicate such action to be warranted."

5

After mediation in May 2003 Grove Investment agreed to dismiss its complaint without prejudice to permit further investigation of the Santa Ana property to evaluate the extent of the contamination and the technology needed to economically remediate it. The belief was that the additional investigation might facilitate settlement of the action. The Rockwell entities agreed to pay $95,000 of the $400,000 cost to complete the investigation and made demand on Continental to fund the payment. According to a declaration filed by Ward Benshoof, Rockwell Collins's attorney in the Grove Investment action and the instant case, Continental and the Rockwell entities disagreed whether the payment was an indemnity obligation, which would reduce the amount of coverage available under the policies, as Continental contended, or a defense cost obligation, as the Rockwell entities contended.[6] "[T]o break the deadlock over funding the settlement," Benshoof stated, Continental proposed the Rockwell entities execute an agreement providing Continental's payment would not be a waiver of its contention the $95,000 was for indemnity. When Benshoof received a draft of the agreement, however, he was surprised it included what he believed was "a substantial and unwarranted expansion of [Continental's] 'reservation of rights.'"

After Benshoof had several conversations with Continental asserting it was not entitled to supplement its initial reservation of rights, on July 7, 2003 Continental sent the Rockwell entities a letter setting forth the expanded list of defenses to coverage. The letter did not include as a defense that Rockwell Collins was not a named insured and Continental had not approved assignment of the policies, but concluded with a broad statement Continental reserved its "right to assert any other policy defense or terms and conditions that may be applicable" upon further analysis. To resolve this new dispute whether Continental could continue to expand its list of coverage defenses, Benshoof proposed the Rockwell entities would permit the expanded list to be included in the agreement if Continental "would commit that it would not, at any time in the future,

6    Although the trial court sustained Continental's objections to Benshoof's description of the dispute and discussions leading to execution of the agreement, as we discuss, the court erred in doing so.

6

attempt to raise any other defenses to coverage." Benshoof declared Continental agreed with only two exceptions: If (1) Grove Investment filed a sixth amended complaint asserting new or different claims or causes of action, or (2) two polices that had not been located were later found and contained conditions that the other policies did not include.

On July 16, 2003 the Rockwell entities and Continental signed the funding agreement.[7] Paragraph 5 provided in part, "[T]he Rockwell Entities acknowledge and agree that Continental's agreement to make the payment set forth in paragraph 4.0, is subject to a full and complete reservation of the CNA Companies' rights under the CNA policies. The Rockwell Entities acknowledge and agree that this Agreement is not, and shall not be deemed to be an admission of any kind by any of the CNA Companies, and that the CNA Companies reserve their rights to assert that the claims asserted against the Rockwell Entities in the Underlying Action are outside of the coverage of the CNA Policies in whole or in part."[8] Paragraph 5.1 stated, "Specifically, the CNA Companies reserve their rights to assert the following defenses to coverage," and subparagraphs A through N then enumerate the defenses described in the July 7, 2003 letter. Paragraph 5.3 set forth Continental's reservation of rights to deny coverage under the missing policies unless and until evidence of the terms and conditions of the policies were provided. Paragraph 5.5 stated, in part, "To the extent the refiled action merely realleges the claims presently alleged in the Underlying Action, the CNA Companies also agree that they will assert no defenses to coverage other than those reflected in paragraphs 5.0 through 5.3 above. The CNA Companies, however, reserve the right to reevaluate coverage to the extent the refiled action alleges new or different claims or causes of action." The

---

[7]     The parties designated the document "Non-Waiver Agreement," presumably because its initial purpose was to establish that Continental's agreement to pay the cost of the additional site investigation was not a waiver of its argument the payment was for indemnity, not defense costs.

[8]     The CNA Companies include Continental and The Fidelity and Casualty Company of New York, which merged with Continental.

agreement further provided it "fully reflects the entire agreement entered into between the Parties concerning the subject matter hereof" and may only be amended in writing.

   4. *Settlement of the Grove Investment Litigation; Assertion of the Named Insured/Lack of Consent Defense*

In November 2005, after additional investigation of the Santa Ana property failed to result in settlement, Grove Investment refiled its fifth amended complaint without adding any new allegations. Trial was set for October 2006, and discovery resumed. During expert discovery and court proceedings in which the Rockwell entities' motions for summary judgments were denied, it became apparent there was a strong possibility Collins Radio would be found liable for the majority of the contamination. In September 2006 Grove Investment made a written settlement demand of $4.85 million. The Rockwell entities recommended to Continental that the offer be accepted. According to Benshoof, Continental's coverage counsel and claims analyst said they had recommended the settlement demand be accepted but requested that Benshoof provide information on the corporate history of the Rockwell entities as part of the approval process.

Within a week of providing the information, Benshoof was informed for the first time in a telephone conversation that Continental had concluded Rockwell Collins was not entitled to the benefits of the Collins Radio policies. In an October 23, 2006 letter Continental stated, "As you know, CNA has been defending the Rockwell Defendants under a full reservation of rights, as communicated . . . in correspondence dated July 9, 2002 and July 7, 2003. In each of these letters, CNA explained that depending upon further investigation into the circumstances surrounding the *Underlying Grove Action*, CNA could ultimately determine no coverage existed for the *Underlying Grove Action*. . . . This is of particular significance now because it has become apparent from the information you have provided to CNA in the last few weeks that 'Rockwell Collins, Inc.' and the other Rockwell Defendants who are parties to the *Underlying Grove Action* are not in fact 'insureds' under CNA's policies at issue in this matter." Continental explained the information demonstrated Rockwell Collins was not in existence when the policies had been issued, and "[i]t is without doubt that Rockwell Collins, Inc. was

8

created from whole cloth and is not the result of a merger. It is likewise without question that CNA did not consent to an assignment of its policies to Rockwell Collins, Inc. or any other of the other Rockwell Defendants."

On October 25, 2006 Continental agreed to fund a $3.7 million settlement on behalf of the Rockwell entities subject to a full and complete reservation of its rights. The amount of defense costs Continental paid for the Rockwell entities was $2.3 million.

5. *The Instant Action; the Motion for Summary Adjudication Regarding Rockwell Collins's Entitlement to Defense and Indemnity Under the Continental Policies*

On August 25, 2006 Continental filed its initial complaint for declaratory relief and contribution, naming Travelers, which had issued primary liability policies to Rockwell International from 1975 through 1985, and other insurers. On May 15, 2007, after the Grove Investment action was settled, Continental filed a first amended complaint adding Rockwell Collins and seeking a declaration Continental had no duty to defend or indemnify Rockwell Collins and was entitled to reimbursement of defense costs and the sum paid to fund the settlement. Thereafter, Rockwell Collins (and related entities) filed a cross-complaint, and both sides filed several amended pleadings.

In February 2008 Continental moved for summary adjudication, contending it had no duty to defend or indemnify Rockwell Collins because it was not the named insured on the Collins Radio policies and had not succeeded to them as a matter of law and Continental had not consented to their assignment. In its opposition Rockwell Collins contended, among other arguments, Continental had waived the defense because it was not enumerated in the parties' funding agreement. In support of its opposition Rockwell Collins submitted Benshoof's declaration describing, among other things, the events leading to execution of the funding agreement. Continental objected to these portions of Benshoof's declaration on the grounds the evidence was inadmissible extrinsic evidence and violated the mediation privilege.

In May 2008 the trial court denied Continental's motion for summary adjudication, finding Rockwell Collins was entitled to coverage under the Collins Radio policies both by operation of law and under a de facto merger theory. With respect to

9

Rockwell Collins's argument Continental had waived its right to present its defense on these grounds, the court found the funding agreement was "ambiguous as to which defenses [Continental] actually intended to preserve" because, notwithstanding the language providing Continental would not assert any new coverage defenses unless Grove Investment refiled an action alleging new or different claims, the agreement also included broad language that Continental's agreement to fund the $95,000 additional investigation was "subject to a full and complete reservation" of Continental's rights. Although it ruled the agreement was ambiguous, the court sustained Continental's objections to Benshoof's declaration, finding it violated the parol evidence rule.

6. *The Court's Determination Continental Was Not Entitled to Equitable Contribution Under the Travelers Policies*

In February 2006 Rockwell Collins and Continental each moved for a determination whether Continental was entitled to equitable contribution from Travelers for defense costs Continental had paid in connection with the Grove Investments litigation.[9] Rockwell Collins contended, as successor to the rights and liabilities of Rockwell International under the Travelers policies, it was essentially self-insured during the years covered by the policies as a result of (1) the formula used to calculate the policy premiums, which included prior year defense costs, (2) the reinsurance agreements with Rockwell International's "captive insurer"[10] Constantine, and (3) the 1994 settlement

[9]    Rockwell Collins and Continental have stipulated the Grove Investments litigation is an environmental damages suit as that term is defined in the 1994 settlement agreement between Rockwell International and Travelers.

[10]    "[C]aptive insurers are either insurance companies which are owned by another organization and whose exclusive purpose is to insure risks of the parent organization and affiliated companies, or in the case of groups and associations, insurance organizations which are owned by the insureds and whose exclusive purpose is to insure risks of member organizations and group or association members and their affiliates." (Ins. Code, § 1216.1, subd. (e)(3).) In light of our holding Continental is entitled to equitable contribution from Travelers for at least the policy years predating execution of the reinsurance agreement, we need not determine whether Constantine was in fact a true captive insurer. This question of fact may well need to be resolved by the trial court following our remand.

agreement between Travelers and Rockwell International.  Accordingly, Rockwell Collins argued, it could not be compelled to pay for any part of its own defense.  (See *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 72 (*Aerojet*) [equitable contribution "has no place between insurer and insured, which have contracted the one with the other"; "[n]either does it have any place between an insurer and an uninsured or 'self-insured'" party].)  For its part, Continental argued the Travelers policies included an express duty to defend and any "side agreements" to which Continental was not a party, such as the reinsurance agreements, premium computation endorsements based in part on prior year losses and the 1994 settlement agreement, could not negate Continental's right to equitable contribution from Travelers, which was a coinsurer covering the same risk.  (See *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1289 (*Fireman's Fund*) ["one insurer's settlement with the insured is not a bar to a separate action against that insurer by the other insurer or insurers for equitable contribution or indemnity"]; *Employers Ins. Co. of Wausau v. Travelers Indemnity Co.* (2006) 141 Cal.App.4th 398, 405 (*Wausau*) [same].)

The trial court accepted Rockwell Collins's analysis, finding Continental did not have a right of equitable contribution pursuant to *Aerojet*, *supra*, 17 Cal.4th 38 because the reinsurance agreements, 1990 commutation agreement between Travelers and Constantine and "most critically" the 1994 settlement agreement, "when read together, effectively made Rockwell a self-insured entity for the entire period during which the Travelers  policies were in effect."  The court explained, "The Travelers policies effectively became 'fronting' policies, once the May 1994 Settlement was entered into. The parties have stipulated that pursuant to the May 1994 Settlement Agreement, Rockwell Collins is obligated to reimburse Travelers for 100% of any defense and indemnity payments made by Travelers for 'Environmental Damage Suits' under the primary Travelers policies for the policy periods April 1, 1975 through October 10, 1983. Pursuant to the terms and conditions of the 1994 Settlement Agreement, Rockwell Collins is also obligated to pay any judgments or settlements against Travelers with respect to equitable contribution Claims regarding the Travelers policies and concerning

11

'Environmental Damage Suits.' (Footnote omitted.) [¶] Given the Court's determination that the 1994 Settlement Agreement operated to transform Rockwell International (and subsequently, Rockwell Collins) into a totally 'self-insured' entity, the Court finds that *Aerojet* is controlling."

## DISCUSSION

### 1. *Continental Has Waived Its Named Insured/Lack-of-Consent Defense*

#### a. *Rockwell Collins was not required to raise this issue by cross-appeal*

As a threshold matter, Continental argues Rockwell Collins is foreclosed from arguing Continental waived its named insured/lack-of-consent defense because Rockwell Collins only raises the argument in opposition to Continental's opening brief on appeal, not in its cross-appeal. Although "it is the general rule that a respondent who has not appealed from the judgment may not urge error on appeal," Code of Civil Procedure section 906 "allow[s] a respondent to assert a legal theory which may result in affirmance of the judgment." (*California State Employees' Assn. v. State Personnel Bd*. (1986) 178 Cal.App.3d 372, 382, fn. 7; see Code Civ. Proc., § 906 ["respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters for the purpose of determining whether or not appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken"]; *Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57 [respondent permitted to raise argument without cross-appeal that trial court reached right result "even if on the wrong theory"].) Here, Rockwell Collins is not seeking any affirmative relief by way of appeal; it simply seeks to preserve the trial court's judgment in its favor. A respondent's brief is the proper vehicle to present such an argument. (See *Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 781.)

There is no reason for a different conclusion merely because Rockwell Collins unnecessarily filed a cross-appeal challenging the trial court's adverse ruling on yet

12

another theory that could serve as a basis for affirming the judgment in its favor.[11] Continental's citation to *Gonzales v. R.J. Novick Constr. Co., Inc.* (1978) 20 Cal.3d 798, 804 to 805 as support for its argument underscores its apparent misunderstanding of these principles of appellate review. *Gonzales* involved a lawsuit by an injured construction worker against a general contractor. The contractor sued the worker's employer for indemnity. After a judgment in favor of the worker on liability and in favor on the contractor on its indemnity claim, the employer appealed, but limited that appeal to the indemnity issue in the cross-complaint. The contractor filed a protective cross-appeal on liability, which it announced it would abandon if the judgment as to indemnity was affirmed. Insofar as it relates to the issue before us, the Supreme Court held only that the employer, having deliberately appealed only a portion of the adverse judgment, could not seek appellate review of the liability issue raised in the contractor's protective cross-appeal. (*Id*. at pp. 804-805.) It did not address, let alone modify, the well-established rule permitting a respondent to assert under Code of Civil Procedure section 906 grounds rejected by the trial court that compel affirmance of a judgment in its favor.

b. *Principles of contract interpretation*; *standard of review*

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; *Parsons v. Bristol Development*

---

[11]    Although the trial court found the Collins Radio policies had transferred to Rockwell Collins by operation of law and de facto merger, Rockwell Collins nevertheless subsequently sought a ruling on whether Continental's refusal to consent to assignment under all circumstances (as the evidence suggested) would have been arbitrary action proscribed by *University of Judaism v. Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937, 942 (arbitrary refusal to consent to assignment "would be inconsistent with the insurer's duty of good faith"). After a bifurcated trial the court held Continental's refusal to consent to assignment did not constitute arbitrary action. This issue could have been raised without a cross-appeal. (See *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 548, fn. 8.)

Because we hold Continental waived its right to assert this defense, we need not address this or any other ground for affirming this portion of the trial court's judgment.

*Co.* (1965) 62 Cal.2d 861, 865; see also Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 (*Wolf*).) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].) The words are to be understood "in their ordinary and popular sense" (Civ. Code, § 1644) and the "whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

Although parol evidence is inadmissible to vary or contradict the clear and unambiguous terms of a written, integrated contract (Code Civ. Proc., § 1856, subd. (a); *Wolf, supra,* 162 Cal.App.4th at p. 1126), extrinsic evidence is admissible to interpret the agreement when a material term is ambiguous. (*City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; see *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 (*Pacific Gas & E. Co.*) [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, susceptible to more than one reasonable interpretation, it may be used to determine contracting parties' intent]; Code Civ. Proc., § 1856, subd. (g) [extrinsic evidence admissible to interpret terms of ambiguous agreement].)

As we explained in *Wolf, supra,* 162 Cal.App.4th 1107, when the meaning of words used in a contract is disputed, the trial court engages in a three-step process: "First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.[12] [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to

_____

12      The trial court's threshold determination of ambiguity is a question of law subject to independent review. (*Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.)

14

the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. [Citations.] This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or [when] extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. [Citations.] If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury." (*Wolf,* at pp. 1126-1127, fn. omitted.)

Waiver is generally a question of fact, and the trial court's findings are reviewed for substantial evidence. (See *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.) However, the question of waiver in the instant case is a question of contract interpretation turning on undisputed extrinsic evidence—Continental does not dispute the substance of Benshoof's declaration explaining the parties' intent with respect to the waiver of defenses that were not enumerated in the funding agreement—and thus a question of law. Moreover, even if not a question of contract interpretation, "'[w]hen . . . the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.'" (*Ibid.*)

c. *The funding agreement is clear; specific language controls over general*

Paragraph 5.5 of the July 16, 2003 funding agreement is clear: Continental agreed it would not assert any defenses to coverage other than those specified in the agreement unless Grove Investment filed an amended complaint with new allegations or claims or certain missing policies were discovered. The named insured/lack-of-consent-to-assignment defense was not identified in the funding agreement. Thus, Continental was barred from asserting that defense because neither condition for expanding its bases for denying coverage occurred. (Grove Investment refiled the identical complaint after additional investigation of the Santa Ana property did not yield a settlement; the missing policies were never located.)

15

As Continental asserts, paragraph 5.0 broadly states Continental's agreement to make the $95,000 payment for additional site investigation "is subject to a full and complete reservation of the CNA Companies' rights under the CNA Policies." But that "full and complete" reservation of rights is then expressly limited by paragraph 5.1, which "[s]pecifically" identifies the defenses to coverage Continental has reserved; paragraphs 5.2 and 5.3, which discuss in more detail the right to deny coverage under the missing policies and the dispute over whether the $95,000 is a defense or indemnity cost; and paragraph 5.5, which removes any doubt about the parties' intentions: "To the extent the refiled action merely alleges the claims presently alleged in the Underlying Action, the CNA Companies also agree that they will assert no defenses to coverage other than those reflected in paragraphs 5.0 through 5.3 above. The CNA Companies, however, reserve the right to reevaluate coverage to the extent the refiled action alleges new or different claims or causes of action."

Even if we were to agree the general language in paragraph 5.0 is inconsistent with paragraph 5.5, the specific language limiting the reservation of rights governs. (See Code Civ. Proc., § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"]; Civ. Code, § 3534 ["[p]articular expressions qualify those which are general"]; cf. *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386 ["specific language of the pilot exclusion clause overrides the general coverage provisions of the insuring clause"].) Moreover, reviewing the contract in its entirety, giving effect to every part as we must, Continental's proposed interpretation is simply not plausible. It would render meaningless its agreement in paragraph 5.5 not to assert any defenses to coverage other than those reflected in paragraphs 5.0 through 5.3 above unless Grove Investment filed an amended action with new or different claims or causes of action or the missing policies were located. (See *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027 ["meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless"].)

#### d. *Extrinsic evidence confirms the parties' intent regarding waiver of additional coverage defenses*

The trial court found the "meaning of the [funding agreement was] ambiguous as to whether [Continental] waived its right to assert *additional* defenses to coverage outside of those set forth in Paragraph 5.1." Yet the court inexplicably sustained Continental's objections to the portions of Benshoof's declaration describing the parties' negotiation of this language and explaining their express intent on the ground the evidence violated the parol evidence rule. That was error. The court should have admitted the declaration, which was undisputed, and considered it to interpret the contract as a matter of law. (See *Pacific Gas & E. Co.*, *supra*, 69 Cal.3d at pp. 39-40; *Wolf*, *supra*, 162 Cal.App.4th at pp. 1126-1127.)[13]

Benshoof's declaration reinforces our conclusion that Continental waived its right to assert any new coverage defenses in the funding agreement unless Grove Investments filed an amended complaint with new claims or the missing policies were located. Benshoof explained, and a June 9, 2003 email attached to his declaration as an exhibit confirmed, Rockwell Collins objected to Continental's inclusion in the funding agreement of an expanded list of reserved rights. The email stated, "Attached please find the [funding agreement], revised to incorporate our changes. The most substantial change we made was to delete Section 5.2. That looked an awful lot like making a new record. [Continental's] reservation of rights are whatever was set forth in its original reservation of rights letter. This Agreement needs to make it clear (as it does) that any funding of [Continental] of the interim settlement is without prejudice to those asserted rights. It should not be used as an occasion to attempt to augment whatever reservations were originally declared. Since that is what Section 5.2 appeared to be doing, it[']s not something we could agree to." Benshoof further explained, after several conversations with Continental's counsel and receipt of the July 7, 2003 letter "wherein [Continental] not only attempted to assert a long list of additional 'reserved rights,' but concluded . . .

---

[13] Rockwell Collins's opening brief unmistakably argues the trial court erred in failing to consider the Benshoof declaration.

17

with a statement, in the penultimate paragraph, that they would continue to assert new coverage defenses in the future 'which may become apparent on further analysis[,]' I advised [Continental's counsel] that we would insist that [Continental] give us assurance that it had in fact done all the analysis that was necessary, and that it would not continue to assert new coverage defenses into the indefinite future . . . ." After additional conversations in which Continental asked for the two exceptions to the blanket prohibition (if the missing policies were found or an amended complaint filed with new or different claims or causes of action), the funding agreement was signed. In the absence of any extrinsic evidence disputing Benshoof's explanation of the parties' intent, there is simply no basis upon which to find Rockwell Collins's interpretation of the agreement is incorrect.

    2. *Continental Is Entitled to Equitable Contribution from Travelers*

        a. *Governing law*

"Equitable contribution . . . applies to apportion costs among insurers that share the same level of liability on the same risk as to the same insured. [Citation.] It 'arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.' [Citation.] 'The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.'" (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089; accord, *St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mutual Ins. Co.* (2012) 210 Cal.App.4th 645, 653; see *Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1295 [equitable contribution "is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no

18

indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor"].)[14]

"Equitable contribution applies *only* between insurers [citation] . . . . It therefore has no place between insurer and insured, which have contracted the one with the other. [Citation.] Neither does it have any place between the insurer and an uninsured or 'self-insured' party." (*Aerojet*, *supra*, 17 Cal.4th at p. 72.) As the Court explained in *Aerojet,* self-insurance "'is equivalent to no insurance . . . .' [Citation.] As such, it is 'repugnant to the [very] concept of insurance . . . .' If insurance requires an undertaking by one to indemnify *another*, it cannot be satisfied by a self-contradictory undertaking by one to indemnify *oneself.*" (*Id.* at p. 72, fn. 20.) In *Aerojet* various insurers had issued Aerojet "typical comprehensive general liability insurance policies" from 1956 to 1975 covering property damage. From 1976 to 1984 Insurance Company of North America (INA) had issued policies that "essentially took a form similar to that of a so-called 'fronting' policy," which "has been described as one 'which does not indemnify' or, apparently, defend 'the insured but which is issued to satisfy financial responsibility laws of various' jurisdictions 'by guaranteeing to third persons who are injured that their claims against' the insured 'will be paid.'" (*Id.* at p. 49 & fn. 3.) The body of the INA policies stated INA had a duty to indemnify and defend Aerojet, but "by endorsement it was provided that (1) INA had a duty to make payments only beyond stated deductible amounts, which matched or approached indemnification limits, and (2) in case of Aerojet's default, INA

---

14    Coinsurers can be, as in the instant case, successive insurers on continuous or progressively deteriorating property damage. "[W]here successive . . . policies have been purchased, bodily injury and property damage that is continuing or progressively deteriorating throughout more than one policy period is potentially covered by all policies in effect during those periods." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 686-687.) The successive insurers are not jointly and severally liable, but are "separately and independently 'obligated to indemnify the insured.'" (*Aerojet*, *supra*, 17 Cal.4th at p. 57, fn.10.) "'[A]llocation of the cost of indemnification' among such insurers 'requires application of principles of contract law to the express terms and limitations of the various policies' [citation] and, in their absence, 'equitable considerations' [citation]." (*Ibid*.)

had a duty to make payments within stated deductible amounts and a corresponding right to obtain reimbursement therefor; and . . . Aerojet should pay its own defense costs—under which provision it was understood by Aerojet that it should defend itself." (*Id.* at pp. 49-50, fn. omitted.) Thus, as essentially self-insured under the fronting policies, Aerojet could not be compelled to contribute to its own defense costs. (*Id.* at p. 72.)

Although equitable contribution is not available from an uninsured or self-insured party, a party that later essentially becomes self-insured for a previously covered period to settle a coverage dispute with coinsurers on the same risk cannot vitiate the non-settling insurers' right of contribution from the settling insurers. "[T]he well-settled rule is that an insurer's obligation to contribute to another insurer's defense or indemnification of a common insured arises independently and is separate from any contractual obligation owed to their insured." (*Wausau*, *supra*, 141 Cal.App.4th at p. 404; see *Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1295.) Thus, in *Wausau* the court held coinsurers that had "bought back their coverage from [the insured] for $24 million" to settle a dispute over coverage of environmental claims were nevertheless required to contribute to the cost incurred by nonsettling coinsurers to defend environmental tort suits filed after the settlement:[15] "[D]efendants' obligation to their insured arose long ago; long before the *Jensen-Kelly* releases and the *Avila and Arlich* actions were filed. [Citations.] At the time of loss, each insurer had a potential obligation to defend and indemnify [the insured] against claims that might arise from a toxic discharge. We are not persuaded that defendants' equitable obligation to share the cost of that defense depends on whether they

---

[15] The insured "released the defendant insurers from any obligation to defend or indemnify it against past, present and future environmental actions and agreed to indemnify the settling carriers against any claims under their policies, including other insurers' claims for contribution." (*Wausau*, *supra*, 141 Cal.App.4th at p. 401.)

settled with their insured before, or after, the *Avila* and *Arlich* suits were filed." (*Wausau*, at p. 405.)[16]

A trial court evaluating claims for equitable contribution "exercises its discretion and weighs the equities seeking to attain distributive justice and equity among the mutually liable insurers. [Citation.] The court may consider numerous factors in making its determination, including the nature of the underlying claim, the relationship of the insured to the various insurers, the particulars of each policy, and any other equitable considerations." (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1231-1232; see *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 ["[w]e expressly decline to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise"].)

> b. *The 1994 settlement agreement does not vitiate Continental's entitlement to equitable contribution*

Rockwell Collins contends, and the trial court found, Continental is not entitled to equitable contribution from Travelers pursuant to *Aerojet* because Rockwell International was self-insured during the years covered by the Travelers policies. Central to the court's conclusion was the 1994 settlement agreement: "The Travelers policies effectively became 'fronting' policies[] once the May 1994 Settlement was entered into."

The court's reliance on the effect of the settlement agreement was improper. Although *Aerojet* holds uninsured and self-insured parties are not required to make an equitable contribution to defense costs, an insured cannot eliminate a coinsurer's right to contribution by an after-the-fact arrangement with one of its insurers. The policies in *Aerojet* were clearly fronting policies ab initio. There were no settlement agreements, policy modifications or reinsurance agreements made during the ensuing years that, when considered together, rendered Aerojet effectively self-insured. As the *Aerojet* Court explained, "At the outset, Aerojet was in fact issued 'fronting' policies by INA. Had the

---

16     Wausau was the primary general liability insurer for three years. The defendant coinsurers had also provided primary general liability insurance during the years the contamination allegedly occurred. (*Wausau, supra*, 141 Cal.App.4th at p. 402.)

21

situation been different, it might have led to different consequences.  But it was not."
(*Aerojet*, *supra*, 17 Cal.4th at p. 72; cf. *Union Oil Co. v. International Ins. Co.* (1995)
37 Cal.App.4th 930, 933, fn. 2 ["Continental policy was considered a 'fronting policy'
because, through an agreement reached between Continental and Union Oil [its insured],
Union Oil's deductible was equal to the limits of liability of the Continental policy"].)

Rockwell Collins contends, without citation to authority, "for purposes of the
doctrine of equitable contribution, the timing of when an insured became completely self-
insured makes no difference."  To the contrary, when the uninsured period arose—
whether the insured elected to forego any insurance (self-insure) or obtained a fronting
policy at the outset of the coverage period, as in *Aerojet*, or subsequently converted a
policy of insurance that actually provided for indemnification into some form of self-
insurance, as here—determines the availability of equitable contribution.  As the *Wausau*
court explained, at the time of loss an insurer has a potential obligation to defend and
indemnify its insured against claims that might arise from a toxic discharge.  (*Wausau,
supra*, 141 Cal.App.4th at p. 405.)  The right of coinsurers of that same risk to
contribution arose at that time based on "'"equitable principles designed to accomplish
ultimate justice in the bearing of a specific burden."'"  (*Ibid*.)  Accordingly, post hoc
modification of the contractual obligations owed to an insured cannot eliminate the right
to equitable contribution among insurers.  (*Id.* at pp. 404-405; see *Fireman's Fund,
supra*, 65 Cal.App.4th at pp. 1294-1295; see also *Centennial Ins. Co. v. United States
Fire Ins. Co*. (2001) 88 Cal.App.4th 105, 115 [insurers' "obligations for contribution to
other *insurers* for the costs of defense are entirely separate from their obligations to their
insured and are adjusted equitably on the basis of all the circumstances of the case"].)  In
sum, although the 1994 settlement agreement may have transferred all risk to Rockwell
Collins for the period covered by the Travelers policies, it simply cannot negate the
coinsurers' right to contribution that existed if the Travelers policies were not fronting
policies ab initio.

c. *The Travelers policies were not fronting policies*

Rockwell Collins asserts the Travelers policies met the classic definition of "'fronting' policies" from their inception—and thus *Aerojet* is controlling—because the combination of premium computation endorsements, deductibles and the complex reinsurance agreement required it to reimburse Travelers for 95 percent of any payments Travelers made. This 95 percent risk shifting increased to 100 percent after the revised premium computation endorsements were issued in 1990 in connection with the parties' commutation agreement.

We certainly agree with Rockwell Collins's characterization of the risk shifting mechanism as a "complex arrangement," but disagree it converted the Travelers policies into fronting policies from their inception. As Rockwell Collins explains, the fundamental issue whether a party is uninsured or self-insured—either through the use of a fronting policy or some other mechanism or circumstance (see generally Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013) ¶ 8:151, pp. 8-46.8 to 8-46.9 (rev. #1 2013))—largely depends on whether the party is responsible for payment of the claim and defense costs, not, as Continental contends, whether there is a policy somewhere in the labyrinth of insurance coverage documents that states the insurer has a duty to defend. We see no reason why a reinsurance agreement with a party's captive insurance company cannot accomplish this in the same way an indemnification provision in the underlying policy or a separate agreement would;[17] it creates no more of a fiction

---

[17] "Reinsurance is '"a special form of insurance obtained by insurance companies to help spread the burden of indemnification. A reinsurance company typically contracts with an insurance company to cover a specified portion of the insurance company's obligation to indemnify a policyholder. . . . This excess insurance . . . enables the insurance companies to write more policies than their reserves would otherwise sustain since [it] guarantees the ability to pay a part of all claims. *The reinsurance contract is not with the insured/policyholder.* When a valid claim is made, the insurance company pays the first level insured, and the reinsurance company pays the insurance company. The reinsurance company's obligation is to the insurance company, and the insurance company vis-a-vis the reinsurer is thus the insured, or more appropriately, the 'reinsured.'"'" (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 368.)

than the fronting policy itself.  (Cf. Internat. Risk Mgt. Institute, Inc., Glossary of Insurance & Risk Management Terms http://www.irmi.com/online/insurance-glossary/terms/f/fronting.aspx (as of Oct. 16, 2013) [defining fronting as "use of a licensed, admitted insurer to issue an insurance policy on behalf of a self-insured organization or captive insurer without the intention of transferring any of the risk.  The risk of loss is retained by the self-insured or captive insurer with an indemnity or reinsurance agreement."]; *Corwin v. DaimlerChrysler Ins. Co.* (Mich. 2012) 819 N.W.2d 68, 72, fn. 3.)  Nevertheless, the problem once again is one of timing.  Unlike in *Aerojet*, in which the insured's obligation to pay for its own defense costs began from the policies' inception, the initial reinsurance agreement between Constantine and Travelers was executed by Travelers in March 1978 and by Constantine in November 1978. Consequently, at least for the policy years from April 1, 1975 through April 1, 1978 Travelers bore the risk of loss.  For the same reasons a party's settlement with its insured does not destroy a coinsurer's right to equitable contribution, neither does an after-the-fact reinsurance agreement between a party's captive insurance company and an insurer.

As to the formula for calculating the Travelers policy premiums, although it apparently included a provision for reimbursement of defense costs, there was a cap on the premium, which was not eliminated until sometime before the commutation agreement was executed in 1990.  Accordingly, Travelers remained responsible for costs in excess of that maximum; to that extent Rockwell Collins was not self-insured.

Moreover, even for those years when the primary policies and reinsurance agreements were entered into contemporaneously, Travelers apparently retained five percent of the risk (at least for most of the coverage years).  Five percent may be small, but it is not zero.  In light of our conclusion Travelers retained significant risk during the early years based upon the policies' provisions at their inception and at least a small portion of risk during later years under the contemporaneous reinsurance agreements, we remand the matter to the trial court for further proceedings to determine the appropriate equitable allocation.  (See *Centennial Ins. Co. v. United States Fire Ins. Co.*, *supra*, 88 Cal.App.4th at p. 111 ["In choosing the appropriate method of allocating defense costs

24

among multiple liability insurance carriers, each insuring the same insured, a trial court must determine which method of allocation will most equitably distribute the obligation among the insurers 'pro rata in proportion to their respective coverage of the risk,' as 'a matter of distributive justice and equity.'"].)

## DISPOSITION

The judgment is affirmed in part and reversed in part, and the matter remanded for further proceedings not inconsistent with this opinion. Each party is to bear its own costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.